**STATE OF HAWAII**, Plaintiff–Appellee, v. **CLYDE PINERO**, Defendant–Appellant

NO. 12990

(CR. NO. 87–711)

JULY 25, 1989

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY NAKAMURA, J.

Clyde Pinero was convicted of murder in the first degree and of unlawfully possessing a firearm after a jury trial in the Circuit Court of the First Circuit. He urges on appeal that the convictions must be set aside because the trial court committed a host of errors that denied him a fair trial. We conclude from a review of the record that the court committed prejudicial error when it (1) permitted testimony about a previous encounter between the defendant and a police officer in which the defendant allegedly attempted to wrest a gun from the officer's hand; (2) permitted two medical experts to state that in their opinions the victim's death was not accidental; (3) failed in instructing the jury to distinguish manslaughter as a possible mitigating defense to murder from manslaughter as a lesser included offense of murder; and (4) failed in instructing the jury to specify the culpable mental state necessary to establish the firearm offense. We therefore set aside the convictions and remand the case to the circuit court for a new trial.

I.

The two–count criminal complaint filed by the Prosecuting Attorney of the City and County of Honolulu charged that Clyde Pinero committed the offense of murder in the first degree by "intentionally or knowingly caus[ing] the death of David Ronk, a peace officer [who was performing] official duties," and that Clyde Pinero, a previously convicted felon, committed the offense of possession of a firearm by a person convicted of

certain crimes by "hav[ing] in his possession or under his control a firearm, to wit, .38 caliber Smith & Wesson revolver[.]" [1]

The chain of events leading to the death of Ronk, an officer of the Honolulu Police Department, began on June 14, 1987 when he and two fellow officers went to Pinero's residence to serve him with a temporary restraining order issued by the Family Court of the First Circuit. Ronk could not serve the order because Pinero apparently saw the officers as they approached the front door of the house and left through the back door. Ronk and three other officers, Dwayne Takayama, Eric Kanda, and Eli Walters, attempted to serve the court order again on the following day.[2] But this time, two officers guarded the rear of the house and another guarded the front while Ronk approached the front door.

Takayama testified at trial that Ronk first spoke to Pinero's mother at the door and then entered the house, followed by Takayama. When asked whether her son was there, the mother replied he was not. Ronk sought and received permission from her to look around the house. He checked the hall closet, then proceeded to the bedrooms. Shortly after Ronk entered the second bedroom, Takayama heard sounds of a scuffle. Takayama ran to the bedroom and saw Ronk grappling with Pinero. The

---

[1] The Complaint filed by the Prosecuting Attorney reads:

COUNT I: On or about the 15th day of June, 1987, in the City and County of Honolulu, State of Hawaii, CLYDE PINERO did intentionally or knowingly cause the death of David Ronk, a peace officer arising out of the performance of official duties, by shooting the said David Ronk, thereby committing the offense of Murder in the First Degree in violation of Sections 707–701(1)(b) and 706–656 of the Hawaii Revised Statutes, as amended.

COUNT II: On or about the 15th day of June, 1987, in the City and County of Honolulu, State of Hawaii, CLYDE PINERO, having previously been convicted of a felony, to wit, Robbery in the Second Degree, did have in his possession or under his control a firearm, to wit, .38 caliber Smith & Wesson revolver, thereby committing the offense of Possession of a Firearm by a Person Convicted of Certain Crimes in violation of Section 134-7(b) of the Hawaii Revised Statutes.

[2] Takayama, Kanda, and Walters testified at trial that Ronk asked them for assistance in serving the temporary restraining order. Takayama also testified that Ronk said two warrants for the arrest of Pinero were outstanding.

Pinero said at trial that he knew the officers were coming to serve the order but he also feared they "would call in and find out" about the two warrants for his arrest.

object of the struggle was the service revolver that the defendant had somehow snatched from the officer. Ronk had his arms around Pinero and was trying to pin the latter's arms down. The gun in Pinero's hand was pointing in the direction of the door so Takayama stepped back momentarily. A shot rang out; Takayama rushed into the bedroom with the other officers, who by then had entered the house through the back door. Ronk had been shot; he died shortly thereafter. The three officers subdued Pinero, handcuffed him, and placed him under arrest.

Testifying in his own defense, Pinero said he was hiding in the bedroom closet when Ronk found him, pulled him out, and applied a chokehold on him. As soon as the officer loosened his hold, the defendant attempted to flee. But Ronk, Pinero claimed, pulled out his service revolver and threatened to shoot the defendant. Fearing he was going to be shot, the defendant said, he wrested the gun from the officer's hand. Ronk then grabbed Pinero and pulled his arm in an effort to point the gun at his head.[3] The struggle continued until the gun went off. Pinero admitted he was holding the weapon when it fired but claimed it "went off by accident."

The prosecutor, obviously aware that Pinero would claim the shooting was an accident, adduced testimony about a prior encounter between Pinero and another police officer, Henry Mattos, during the State's case in chief. Mattos testified that he went to Pinero's home on June 13, 1986 to serve an arrest warrant and found him in the same closet that Ronk found him. When Mattos came upon him there, Pinero lunged at the officer and attempted to grab his service revolver. Defense counsel objected to the introduction of such testimony on grounds that it was irrelevant and

---

[3] Pinero described what happened after he obtained control of the gun in these terms:

> He [Ronk] went go grab my hand, he went bring 'em up like the kind, like I [sic] was facing towards me, I thought he was going trying to make me—trying to make my arm bring the gun to my face, I went pull 'em away one time and then I was holding 'em again. . . .
>
> I was trying to hold his hand and hold the gun away and trying to keep away from the gun, from pointing my face. . . .
>
> And then I was trying to hold 'em away and then I couldn't hold 'em already, you know, it's just like when you playing arm wrestle like that, your hands can hold so much and cannot hold 'em any more; I just gave up and my hand went back.

highly prejudicial. The trial court overruled the objection, stating the testimony was admissible under Haw. R. Evid. 404.

The Deputy Medical Examiner of the City and County of Honolulu, who performed the autopsy on Ronk, gave testimony about her findings. The medical examiner, Dr. Mary Flynn, described the wounds inflicted upon Ronk and the path of the .38 caliber bullet through his body. She attributed his death to a gunshot wound to his chest. And in her opinion the death was a "homicide" rather than an "accident."

The prosecutor elicited similar opinion testimony from Dr. Vincent DiMaio, Chief Medical Examiner and Director of the Regional Crime Laboratory for Bexar County, Texas. Dr. DiMaio, professedly an expert in anatomical, clinical, and forensic pathology with particular expertise in wound ballistics, reiterated Dr. Flynn's view that Ronk's death was not the result of an accident. Among the opinions expressed by Dr. DiMaio was one that burn marks on Ronk's body and anatomic limits on arm movement led him to believe Ronk could not have been holding the gun when it was fired. His further view was that a .38 caliber Smith and Wesson revolver would not fire merely upon impact with another object because it would not fire unless ten to twelve pounds of pressure on the trigger were applied. He summed up his testimony with these terse sentences: "Some one individual shot another. That's a homicide."

The instructions given to the jury after the close of all evidence included one covering manslaughter and its relation to murder; it read:

> In this case, you must first determine whether the Defendant is guilty or not guilty of Murder in the First Degree. If you find that the offense of Murder in the First Degree has not been proved from the evidence beyond a reasonable doubt, you may then consider whether the Defendant is guilty or not guilty of the lesser included offense of Manslaughter.
>
> A person commits the offense of Manslaughter if he recklessly causes the death of another person; or in a prosecution for murder it is a defense, which reduces the offense to Manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

The jury during deliberations asked the court for a "legal definition of the elements of the lesser charge of manslaughter." The court responded by referring the jury to the foregoing instruction.

The trial court's instruction to the jury with respect to the charge that the defendant unlawfully possessed a firearm read as follows:

> The defendant is charged with the offense of possession of a firearm by a person convicted of certain crimes.
>
> A person commits the offense of possession of a firearm by a person convicted of certain crimes if he has previously been convicted of a felony, and has in his possession or under his control any firearm.
>
> There are two material elements of possession of a firearm by a person convicted of certain crimes, each of which must be proven by the prosecution beyond a reasonable doubt. If the State has done so, you are to convict; if the State has not done so, you are to acquit.
>
> These two material elements are:
>
> 1. The defendant has been convicted of having committed a felony; and
>
> 2. After the date of this conviction, the defendant did have in his possession or under his control a firearm.

The jury returned a verdict finding the defendant guilty as charged in both counts of the complaint. He perfected a timely appeal to this court from the judgment that followed.

## II.

We begin our consideration of the appeal by discussing the claim of error in the introduction of evidence about the prior encounter between the defendant and a police officer.

## A.

Haw. R. Evid. 404(b) prevents the introduction of "[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show that he acted in conformity therewith." The framers of the rule recognized that such evidence "tends to distract the trier of fact from the main question of what actually happened on the particular occasion."

Haw. R. Evid. 404, Commentary (quoting Federal Rules of Evidence (Fed. R. Evid.) 404 advisory committee's note). "It . . . permits the trier . . . to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened." *Id.* Haw. R. Evid. 404(b) thus codifies the common law rule "that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he committed the crime for which he is on trial." E.W. Cleary, *McCormick on Evidence* § 190, at 557–58 (3d ed. 1984) (footnotes omitted); *see, e.g., State v. Apao*, 59 Haw. 625, 638–39, 586 P.2d 250, 259 (1978); *State v. Iaukea*, 56 Haw. 343, 348–54, 537 P.2d 724, 729–32 (1975).

Evidence of other crimes, wrongs, or acts "may, however, be admissible where [it] is probative of any other fact that is of consequence to the determination of the [case], such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." Haw. R. Evid. 404(b). But its acknowledged tendency to distract the trier of fact compels the trial court to weigh the evidence and to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Haw. R. Evid. 403.

### B.

In ruling evidence of Clyde Pinero's prior conduct in the encounter with Henry Mattos admissible, the trial court cited Haw. R. Evid. 404(b) but did not say why the evidence had a "tendency to make the existence of any fact that [was] of consequence to the determination of the [case] more probable or less probable[.]" Haw. R. Evid. 401.[4] The prosecutor maintains the evidence was admissible because it tended to make it less prob-

---

[4] Haw. R. Evid. 401 reads:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

able that the death of Ronk was the result of an accident as claimed by the defendant. The evidence may have been relevant, but it had a tendency nonetheless to distract the trier of fact from the main question of what happened on the particular occasion described in the complaint by suggesting that because Clyde Pinero was a person of criminal character, it was likely that he committed the crime for which he was on trial. Thus, the trial court was obliged to weigh its probative value against the danger of unfair prejudice. Nothing in the record even intimates this was done.

When evidence of other criminal acts of the defendant is offered to prove a fact of consequence in the determination of the case, the trial court must weigh a variety of factors before ruling it admissible. These include "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the . . . time that has elapsed between . [them], the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility." E.W. Cleary, *supra*, at 565; *see also State v. Murphy*, 59 Haw. 1, 9, 575 P.2d 448, 455 (1978).

What was admitted here was evidence of an year–old incident in which Pinero attempted to wrest a gun away from another police officer who came upon him under somewhat similar circumstances. Since Takayama earlier testified about seeing Ronk's service revolver in Pinero's hand, we cannot say the need for the evidence Mattos had to offer was great. But the evidence given by him was such that there was a probability of a hostile reaction against Pinero. We would have to say on balance, its admission constituted an abuse of discretion.

### III.

Having decided that Mattos' testimony was subject to exclusion, we turn to the defendant's claim of error with respect to the admission of the opinion testimony of two medical experts that Ronk's death was a "homicide" rather than an "accident."

### A.

By reason of Haw. R. Evid. 702, "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the

evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." "The critical inquiry with respect to [the admissibility of] expert testimony . . . is whether [it] 'will assist the trier of fact to understand the evidence or determine a fact in issue . . . .' Rule 702, Haw. R. Evid." *State v. Kim*, 64 Haw. 598, 604, 645 P.2d 1330, 1336 (1982).

Generally, the testimony is admissible if it is based "upon a sound factual foundation," the inferences drawn or opinions rendered by the witness are "the product of an explicable and reliable system of analysis," and his opinions "add to the common understanding of the jury." *Id.* (citing *United States v. Fosher*, 590 F.2d 381 (1st Cir. 1979), and Haw. R. Evid. 703 and 705). But of course the testimony is inadmissible if its probative value is substantially outweighed by the risks of unfair prejudice, confusion, or waste of time. Haw. R. Evid. 403.

Our rules of evidence also countenance the reception of expert testimony in the form of an inference or opinion embracing an ultimate issue to be decided by the trier of fact if the testimony is otherwise admissible. Haw. R. Evid. 704. "The old rule that an expert may not 'invade the function of the jury' by giving an opinion on the ultimate issue has succumbed to the attacks of scholars and is no longer of any significance." 2 C. Wright, *Federal Practice and Procedure: Criminal 2d* § 455, at 630 (1982).

But the new rule did not open the door to all opinions. "There are . . . questions that would not be helpful to the jury because they are so conclusionary, and these questions may not be asked." *Id.* For example, opinions that "merely tell the jury what result to reach, somewhat in the manner of the oath–helpers of an earlier day[,]" are subject to exclusion. Haw. R. Evid. 704, Commentary (quoting Fed. R. Evid. 704 advisory committee's note). So are "opinions phrased in terms of inadequately explored legal criteria." *Id.* "Thus the question, 'Did T have the capacity to make a will?' [should] be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' [should] be allowed." *Id.*

## B.

Dr. Mary Flynn, the City's deputy medical examiner, first told the jury of her field of medical expertise, which among other things dealt "with determining the manner of death." When asked about options available to her as a forensic pathologist in describing findings on the manner of death, she replied:

> The options in general are two. It is either a natural death or a violent death. And violent death category is broken down further into subcategories. Those include homicide, suicide, accident, or undetermined.

The prosecutor later sought her opinion regarding Ronk's death. The recorded colloquy between the interrogator and the witness reads:

> Q With regard to this particular case, Doctor, you came to a conclusion as to the manner of death; is that correct?
>
> A Yes, I did.
>
> Q What is your opinion as to the manner of death in this particular case?
>
> A The manner of death is homicide.
>
> Q As opposed to accidental?
>
> A That's correct.

The prosecutor also sought an opinion on whether or not Ronk's death was an accident from the other forensic pathologist called by the State, Dr. Vincent DiMaio. The recorded colloquy between the prosecutor and the medical examiner from Texas, in relevant part, reads:

> Q In your professional opinion, Doctor, of the facts and circumstances of this case, was an accident involved?
>
> MR. THOMPSON: Objection, your Honor. Improper foundation.
>
> THE COURT: Overruled.
>
> THE WITNESS: It's a homicide. Some one individual shot another. That's a homicide.

"The task of separating impermissible questions which call for overbroad or legal responses from permissible questions is not a facile one." *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir. 1983). But as the advisory committee's note to Fed. R. Evid. 704 and the Commentary on Haw. R. Evid. 704 teach us, "questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the

rule intended to allow a witness to give *legal* conclusions." 698 F.2d at 240 (emphasis in original).[5] The questions put to the witnesses and the answers they gave were plainly beyond the intendment of the rule; the questions were conclusionary, and the answers told the jury what result to reach. Moreover, the opinions were "phrased in terms of inadequately explored . . . criteria" related to criminal homicide. Haw. R. Evid. 704, Commentary. They could hardly have been helpful to the trier of fact. If anything, they created a risk of confusion between the opinions and the court's instructions at the close of evidence; they should have been excluded.

## IV.

Turning from errors in the reception of evidence to the defendant's claim of error in the jury instruction covering manslaughter, we begin our analysis by reviewing the relevant provisions of the Penal Code.

## A.

Reduced to its simplest terms, "a crime consists in the concurrence of prohibited conduct and a culpable mental state. Each crime, of course, has its own type of culpable mental state (often called 'mens rea')." 1 C.E. Torcia, *Wharton's Criminal Law* § 27, at 135 (14th ed. 1978). Thus under the Penal Code, "[e]xcept as provided in [HRS §] 702–212,[6] a person

---

[5] "Regardless of the rule concerning admissibility of opinion upon ultimate facts, courts do not permit opinion on a question of law, unless the issue concerns a question of foreign law." E.W. Cleary, *supra*, § 12, at 31 (citations omitted). The "special legal knowledge of the judge" renders expert opinions on questions of law unnecessary. 7 J. Wigmore, *Evidence* § 1952, at 103 (Chadbourn rev. ed. 1978).

[6] HRS § 702–212 reads:

The state of mind requirements prescribed by sections 702–204 and 702–207 through 702–211 do not apply to:

(1) An offense which constitutes a violation, unless the state of mind requirement involved is included in the definition of the violation or a legislative purpose to impose such a requirement plainly appears; or

is not guilty of an offense unless he acted intentionally, knowingly, recklessly, or negligently, as the law specifies, with respect to each element of the offense.". HRS § 702–204 (footnote added).[7]

The offense Pinero was charged with, murder in the first degree, is defined by section 707–701 of the Penal Code; "[a] person commits the offense of murder in the first degree if [he] intentionally or knowingly causes the death of:

> . . . .
>
> (b) A peace officer, judge, or prosecutor arising out of the performance of official duties[.]"

HRS § 707–701(1)(b). The related offense of manslaughter is defined by section 707–702 of the Penal Code; "[a] person commits the offense of manslaughter if: (a) He recklessly causes the death of another person; or. (b) He intentionally causes another person to commit suicide." HRS § 707–702(1). But the foregoing section of the Code also provides:

> In a prosecution for murder in the first and second degrees it is a defense, which reduces the offense to manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional

---

(2)    A crime defined by statute other than this Code, insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears.

[7] Modern penal codes have consistently followed the lead of the Model Penal Code by utilizing only four culpable mental states and by defining them in a substantially similar way.

The basic distinction between a person who acts "purposely" ("intentionally") and one who acts "knowingly" is that the former actor *desires* to engage in given conduct (which happens to amount to a crime) or *desires* by his conduct to cause a prohibited harmful result, while the latter actor is merely *aware* that he is engaging in given conduct (which happens to amount to a crime) or is *aware* that it is practically certain that his conduct will cause a prohibited harmful result.

The difference between the terms "recklessly" and "negligently", as usually defined, is one of kind, rather than of degree. Each actor creates a *risk* of harm. The reckless actor is *aware* of the risk and disregards it; the negligent actor is *not aware* of the risk but should have been aware of it.

1 C.E. Torcia, *supra*, § 27, at 140 (footnote omitted). *See also* HRS § 702–206, Commentary.

disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

HRS § 707–702(2).

Manslaughter as defined by section 707–702(1)(a) unquestionably is a lesser included offense of murder since one cannot commit murder without also having committed manslaughter. *United States v. Iron Shell*, 633 F.2d 77, 88 (8th Cir. 1980), *cert. denied*, 450 U.S. 1001 (1981). The prohibited conduct in both involves the killing of another human being, and the culpable mental state required to establish manslaughter stands below that required to prove murder in the descending order of culpability delineated in the Penal Code. *See* HRS § 702–208, Commentary ("intent, knowledge, recklessness, and negligence are in a descending order of culpability"). Manslaughter as defined by HRS § 707–702(1)(a) thus may be established by the same or less than all the facts required to prove murder; and this renders it a lesser included offense of murder. *See* HRS § 701–109(4);[8] *State v. Kupau*, 63 Haw. 1, 3–4, 620 P.2d 250, 251–52 (1980).

The provisions of HRS § 707–702(2), however, do not describe an offense as such; they serve, instead, "to reduce murder to manslaughter 'when mitigating mental or emotional disturbances are present.' *See* HRS § 707–702 commentary." *State v. Russo*, 69 Haw. ____, ____, 734 P.2d 156, 159 (1987). The offense, more accurately the mitigating

---

[8] HRS § 701–109(4) reads:

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

(a)      It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(b)      It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c)      It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

defense, has been characterized as "voluntary manslaughter [because it] involves the intentional [or knowing] killing of another while under the influence of a reasonably induced [extreme mental or] emotional disturbance . . . causing a temporary loss of normal self–control." W.R. LaFave & A. Scott, Jr., *Criminal Law* § 76, at 573 (1972) (footnote omitted). But for the presence of these extenuating circumstances the intentional or knowing killing of another human being would be murder, unless of course it is justifiable under other provisions of the Penal Code.

## B.

In the case at bar, the trial court's Instruction No. 14 told the jury to "first determine whether the Defendant [was] guilty or not guilty of Mur-. der in the First Degree." The instruction then told the jury that "[i]f [it] found . . . the offense of Murder in the First Degree [had] not been proved . . . beyond a reasonable doubt, [it could] then consider whether the Defendant [was] guilty or not guilty of the lesser included offense of Manslaughter." The charge to the jury went on to say:

A person commits the offense of Manslaughter if he recklessly causes the death of another person; or in a prosecution for murder it is a defense, which reduces the offense to Manslaughter, that the defendant was, at the time he caused the death of the other person, under the influence of extreme mental or emotional disturbance for which there is a reasonable explanation. The reasonableness of the explanation shall be determined from the viewpoint of a person in the defendant's situation under the circumstances as he believed them to be.

The charge, however, said nothing about when the mitigating defense should be considered. The defendant argues the instruction that "combined the 'reckless' and 'reduced' forms of manslaughter . . . into one statement of law . . . either misled the jury into believing there was only one type of manslaughter or confused the jury regarding the specific elements of each." We would have to agree the trial court erred, not so much in what it said but in what it didn't say.

We cannot fault the trial court's instruction to the jury to first consider whether or not the defendant was guilty of the charged offense and if it found the offense had not been proved, to then proceed to the lesser offense. "If [a lesser–included offense] instruction is given, it is customary

to tell the jury to consider first the greater offense, and to move on to consideration of the lesser offense only if they have some reasonable doubt as to guilt of the greater offense." 2 C. Wright, *supra*, § 498, at 800; *State v. Reyes*, 5 Haw. App. 651, 658 n.5, 706 P.2d 1326, 1330 n.5 (1985).

The trial court's error here was one of omission; it failed to fully explain the significance of HRS § 707–702(2) and to guide the jury in its consideration of the mitigating defense. The lesser–included offense instruction may well have had an effect of precluding consideration of possibly extenuating circumstances during deliberations on the charge of murder in the first degree. *See State v. Osburn*, 9 Ohio App. 3d 343, 343, 460 N.E.2d 314, 315 (1983).

The State, however, would have us rule no error was committed because the evidence did not warrant a jury instruction on the mitigating defense. But the rule we have adopted states the defendant "is entitled to an instruction on every defense or theory of defense having *any* support in the evidence, provided such evidence would support the consideration of that issue by the jury, no matter how weak, inconclusive or unsatisfactory the evidence may be." *State v. O'Daniel*, 62 Haw. 518, 527–28, 616 P.2d 1383, 1390 (1980) (emphasis in original). And we view "the evidence . . . in a light most favorable to the appellant in determining whether or not the instruction should [have been] given." *Id.* at 528, 616 P.2d at 1390–91. Viewed in this light, the evidence was sufficient to support an instruction on the mitigating defense. Thus, the trial court erred here too.[9]

## V.

The remaining claim of trial error worthy of discussion is the defendant's claim that the trial court's dereliction in not specifying the mental state necessary to establish a violation of HRS § 134–7(b) constituted prejudicial error. We begin our analysis with a look at the statute.

_____

[9] In *State v. Miyahira*, 6 Haw. App. 320, 322 n.1, 721 P.2d 718, 720 n.1 (1986), the Intermediate Court of Appeals ruled the trial court did not err in instructing the jury to first determine whether the defendant was guilty of murder and if it found murder had not been proved beyond a reasonable doubt, to then consider whether the defendant was guilty or not guilty of manslaugher as described by HRS § 707–702(2). To the extent that *State v. Miyahira* is inconsistent with this opinion, it is overruled.

A.

When Clyde Pinero allegedly violated HRS § 134–7(b),[10] the statute was worded as follows:

> No person who is under indictment or who has waived indictment for, or has been convicted in this State or elsewhere of having committed a felony, or any crime of violence, or of the illegal sale of any drug, shall own or have in the person's possession or under the person's control any firearm or ammunition therefor.

It described the conduct prohibited thereby in fairly lucid terms but said nothing about the concurrent mental state rendering the conduct criminal. The void in this regard of course is not fatal; for "[w]hen the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly." HRS § 702–204.

The foregoing section of the Penal Code, however, may not necessarily govern the situation at hand, for "[t]he state of mind requirements prescribed by section[] 702–204 . . . do not apply to:

> . . . .
>
> (2)     A crime defined by statute other than this Code, insofar as a legislative purpose to impose absolute liability for such offense or with respect to any element thereof plainly appears."

HRS § 702–212(2).

The crime in question is one defined by a statute other than the Penal Code. But a legislative purpose to impose absolute liability with respect to the mental element of the offense does not plainly appear in the statute. Thus, this element of the crime defined by HRS § 134–7(b) is established when a previously convicted felon possesses or controls a firearm "intentionally, knowingly, or recklessly." HRS § 702–204.

---

[10] HRS § 134–7(b) has been amended since "to clarify and improve [its] language[.]" 1988 Haw. Sess. Laws, ch. 275.

## B.

The trial court in instructing the jury, however, neglected to tell the jury about the mental element of the crime. "It is a grave error to submit a [criminal] case to a jury without accurately defining the offense charged and its elements." 2 C. Wright, *supra*, § 487, at 723. The State does not deny the trial court should have advised the jury of all the elements of the crime defined by HRS § 134–7(b), including the required mental state. But it argues the defendant was not prejudiced thereby.

Still, "[e]rroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Turner v. Willis*, 59 Haw. 319, 326, 582 P.2d 710, 715 (1978). We would not say it so appears.

The convictions are vacated, and the case is remanded to the circuit court for a new trial.

*Richard W. Pollack*, Public Defender (*Seth T. Thompson*, Deputy Public Defender, with him on the briefs) for appellant.

*Alexa D.M. Fujise*, Deputy Prosecuting Attorney, for appellee.