100 P.3d 607

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**James CARVALHO, Defendant–Appellant.**

No. 25947.

Intermediate Court of Appeals of Hawai'i.

Oct. 22, 2004.

Certiorari Denied Nov. 29, 2004.

14

Earle A. Partington, on the briefs, Honolulu, for defendant-appellant.

Mangmang Qiu Brown, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by LIM, J.

James Carvalho (Carvalho) appeals the June 10, 2003 judgment of the circuit court of the first circuit,[1] as amended on June 18, 2003,[2] that convicted him of the included offense of assault in the third degree in count I of the complaint (charged as assault in the second degree)[3] and the charged offense of simple trespass in count II.[4] The court sen-

---

1. The Honorable Derrick H.M. Chan, judge presiding.

2. James Carvalho (Carvalho) filed his notice of appeal on July 3, 2003. A second amended judgment was filed on July 7, 2003 to correct a reference that indicated Carvalho had pled guilty to the two charges.

3. Hawaii Revised Statutes (HRS) § 707-711(1)(a) (1993) provides that, "A person commits the offense of assault in the second degree if: The person intentionally or knowingly causes substantial bodily injury to another[.]" (Enumeration omitted; format modified.) HRS § 707-700 (Supp.2003) defines "substantial bod-

ily injury" as "bodily injury which causes: A major avulsion, laceration, or penetration of the skin[.]" (Enumeration omitted; format modified.) HRS § 707-712(1)(a) (1993) provides that, "A person commits the offense of assault in the third degree if the person: Intentionally, knowingly, or recklessly causes bodily injury to another person[.]" (Enumeration omitted; format modified.) HRS § 707-700 (1993) defines "bodily injury" as "physical pain, illness, or any impairment of physical condition."

4. HRS § 708-815(1) (1993) provides that, "A person commits the offense of simple trespass if the person knowingly enters or remains unlawfully in or upon premises." HRS § 708-800

tenced Carvalho to concurrent jail terms of one year in count I and thirty days in count II.[5] Subject to note 5, *supra*, we affirm.

## I. Background.

At the February 2003 jury trial, the State presented testimony from the complaining witness, Larry Richard Melcher (Melcher). Melcher was sixty-five years old at the time of the trial. Shortly after noon on August 23, 2001, Melcher, a realtor, went to an unoccupied house he had in escrow to meet the buyer's realtor and some termite inspectors. Melcher arrived before the others and was surprised to see an electrical extension cord plugged into the outside laundry plug of the house. From there, the cord ran under the chainlink fence separating the house from the adjacent residence, up the wall of the other house and into a bedroom window. Melcher noticed a woman with a small boy on the other side of the fence and told her, "You're stealing our electricity." In response, the woman pointed to the boy and said, "He must have done it." The woman then shrugged and walked away. Melcher called 911 to report the theft of electricity.

At that point, Melcher heard yelling coming from the bedroom of the other house. Melcher recalled that "it was every f'ing word I think you could ever hear. He used it for an adjective.... There was no gist. It was just swearing, swearing, swearing, more swearing." After about three minutes, an angry-looking Carvalho—still spouting epithets—approached from the other house accompanied by two pit bull dogs. Still swearing, Carvalho pulled the cord out of the plug, but Melcher had also taken ahold of the cord as evidence of theft. A tug-of-war and a tussle ensued, during which Carvalho whipped Melcher with the cord and spat on him, then struck the bespectacled Melcher twice, and hard, in the area of his right eye.

Eventually, Carvalho started walking away, but then he returned, this time acting "more aggressive," so Melcher started yelling for help. Apparently, Melcher had 911 on the line during most of the incident. An audiotape of Melcher's 911 call or calls was played for the jury. In it, the voices of Melcher and Carvalho can be heard.

At some point, the police arrived. Before he was taken to the emergency room, Melcher identified Carvalho as his assailant. Dr. Stuart Lerner (Dr. Lerner), the emergency room doctor who treated Melcher, described the eighteen millimeter, "slightly gaping" wound over Melcher's right eyebrow as a "major laceration." The cut required five stitches.

Melanie Yuson (Yuson), Carvalho's girlfriend, was his first witness. She and their four-year-old son were the ones confronted by Melcher about stealing electricity. Yuson blamed the cord's placement on child's play. Yuson claimed that Melcher drove up in his van and started yelling about "stealing and trespassing." Carvalho, who had been sleeping, heard Melcher yelling at Yuson, so he came out of the house and started yelling back. Carvalho then climbed over the fence and tried to remove the cord. As he was doing so, Yuson's one-year-old pit bulls, whom she described as "puppies," came out and started jumping on Melcher and licking his feet. Melcher started yelling, "Help. Help. They're attacking me. They're attacking me. They're pitbulls." Melcher then got on his cell phone to 911. He also yanked on the cord Carvalho was holding, whereupon Carvalho showed Yuson the result—a bent and broken right ring finger. Words were exchanged between Melcher and Carvalho. Carvalho then turned to leave, but he was grabbed by Melcher, who said, "You're not going anywhere." Carvalho pushed Melcher

(1993) provides in pertinent part that, " 'Premises' includes any building and any real property." The same section provides that, "A person 'enters or remains unlawfully' in or upon premises when the person is not licensed, invited, or otherwise privileged to do so."

5. *Sua sponte*, we notice that HRS § 708–815(2) (1993) grades simple trespass as a violation. Hence, we must in any event vacate the July 7,

2003 second amended judgment, insofar as it imposes a thirty-day jail term for simple trespass in count II, and remand for re-sentencing as a violation. *See* HRS § 701–107(5) (1993); *State v. Simeona*, 10 Haw.App. 220, 231, 864 P.2d 1109, 1115 (1993) ("[n]o imprisonment may follow conviction of a violation" (quoting Commentary on HRS § 701–107) (block quote format omitted)), *overruled on other grounds by State v. Ford*, 84 Hawai'i 65, 70, 929 P.2d 78, 83 (1996).

and told him he was going to sue him for the broken finger. Carvalho demanded, "Let me go." After a final exchange of words, Carvalho walked away. Yuson maintained that Carvalho did not strike Melcher.

On cross-examination, Yuson confirmed that Carvalho was sleeping in the bedroom when Melcher arrived that summer afternoon, but denied that the air conditioner was on in the bedroom, claiming it was broken. Yuson also admitted that the electricity in their house had been turned off, but explained that they were in the process of moving.

Carvalho was thirty-seven years old at the time of the incident. He testified that he was sleeping in the bedroom when he heard Melcher yelling at Yuson, something about trespassing and stealing power. "And so I got up and I yelled out the window what the F was he yelling at her for." Carvalho went outside and confronted Melcher. When Carvalho realized that the extension cord was the problem, he jumped the fence and walked past Melcher into the open air garage to retrieve it. Meanwhile, the two continued to argue and yell at each other. As Carvalho was trying to roll up the cord, Melcher grabbed it and told Carvalho to let go. Then Melcher yanked the cord, and Carvalho heard a bone in his right ring finger "pop." Carvalho got angry and threatened to sue Melcher, but started to walk away, content to utter a few parting shots. As Carvalho reached down once again to pick up the cord,

Melcher attempted to grab Carvalho, but Carvalho pushed Melcher away and told him, "Get the fuck off of me."

Carvalho remembered that Melcher had his cell phone out during the struggle over the cord, and that Melcher was yelling for help and accusing Carvalho of hitting him. Carvalho found the accusation ludicrous, and told him so, calling him "a sick old man." Carvalho denied using his hand to strike Melcher. Carvalho did remember hearing Melcher collide with something—perhaps one of the posts supporting the garage roof—when Carvalho pushed him away, then exclaim, "Oh my God. I'm bleeding." Carvalho looked back at Melcher and said, "Good for you," or something to that effect. Carvalho then walked off the premises. Carvalho had almost reached the gate to his own residence when the police arrived and arrested him.

The defense rested after Carvalho's testimony. However, just before the court instructed the jury, the parties stipulated that Dr. Lerner, if called to testify, would say that he examined Carvalho's right ring finger in the emergency room on August 23, 2001, and found it to be fractured.

## II. Discussion.

Carvalho presses a single point of plain error[6] on appeal. He claims the following remarks the deputy prosecuting attorney (DPA) made during closing argument amounted to prosecutorial misconduct:[7]

---

6. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) (2003) provides that, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." Obversely, HRPP Rule 52(a) (2003) provides that, "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." "The general rule is that a reviewing court will not consider issues not raised before the trial court." *State v. Corpuz*, 3 Haw.App. 206, 211, 646 P.2d 976, 980 (1982). "This court's power to deal with plain error is one to be exercised sparingly and with caution because the plain error rule represents a departure from a presupposition of the adversary system—that a party must look to his or her counsel for protection and bear the cost of counsel's mistakes." *State v. Kelekolio*, 74 Haw. 479, 515, 849 P.2d 58, 74–75 (1993) (citation omitted). "This court will apply the plain error standard of review to correct errors which seriously affect the fairness, integrity, or public reputation

of judicial proceedings, to serve the ends of justice, and to prevent the denial of fundamental rights." *State v. Vanstory*, 91 Hawai'i 33, 42, 979 P.2d 1059, 1068 (1999) (brackets, citation and internal quotation marks omitted).

7. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff*, 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "It is a well-settled principle in this jurisdiction that allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction. Factors to consider are: (1) the nature of the conduct; (2) the promptness of a curative in-

Now after having heard the government's case and the defense case it must be clear at this point that there is a pure credibility dispute over what happened. *To put it in another way, to put it more bluntly, either you can believe Richard Melcher about what happened or you can believe Melanie Yuson and Mr. Carvalho. You cannot believe both of then* [sic]. *Somebody is not telling you the truth.* Opening Brief at 6 (emphasis in the original; citation to the record omitted). This, Carvalho suggests, was a misstatement of law "that in effect distort[ed] the burden of proof by suggesting incorrectly what the jury must find [8] in order to reach a certain verdict." Opening Brief at 7 (citation omitted; footnote supplied). We disagree.

A more expansive excerpt of the DPA's closing argument affords salutary context:

And really when everything boils down, what do we have here? I'm not going to make a long summary of what the various witnesses testified to 'cause this was a short trial. Some of you took notes. Some of you didn't. But it wasn't the kind of thing where I need to come back and remind you of what the witnesses said because it's all fresh in mind.

Now after having heard the government's case and the defense case it must be clear at this point that there is a pure credibility dispute over what happened. To put it in another way, to put it more bluntly, either you can believe Richard Melcher about what happened or you can believe Melanie Yuson and Mr. Carvalho. You cannot believe both of them. Somebody is not telling you the truth.

And how do you handle that? The government will suggest to you that the best way in this case is to look to the circumstantial evidence of the audiotape and listen to it with a view to deciding whose story it supports, Richard Melcher's or the defendant's.

So with that I'd like to play the tape again for you. It's not that long.

Thus, it is clear that what we have here is, quite simply, the DPA pointing out the diametrical testimonies adduced by the parties and proceeding to argue whose testimony was more credible. Although the DPA should have eschewed his hyperbolic, either-or dichotomy for a more accurate, nuanced analysis, he did not commit misconduct, because his was a comment confined to the question of credibility and credibility alone, and he did not venture beyond it to explicitly or implicitly "distort the burden of proof by suggesting incorrectly what the jury must find in order to reach a certain verdict[,]" *United States v. Vargas,* 583 F.2d 380, 386 (7th Cir.1978) (citation omitted), which is the *common gravamen* of the prosecutorial improprieties identified in the cases Carvalho cites for support. *See id.* at 387 (it was prosecutorial misconduct to argue that, in order to find the defendant not guilty, the jury must decide that the federal agents who testified lied); *United States v. Phillips,* 527 F.2d 1021, 1022–23 (7th Cir.1975) (it was improper to argue that, in order to find the defendant not guilty, the jury would have to decide that the government agent planted evidence and thereby conspired with the prosecuting attorney to commit the crime of violating the defendants' civil rights); *United States v. Reed,* 724 F.2d 677, 681 (8th Cir. 1984) (it was improper for the prosecuting attorney to argue that, in order to acquit the defendant, the jury must find that the defen-

---

struction; and (3) the strength or weakness of the evidence against the defendant." *State v. Klinge,* 92 Hawai'i 577, 590, 994 P.2d 509, 522 (2000) (brackets, citations, and internal quotation marks and block quote format omitted). As a threshold matter, we consider whether the actions of the prosecutor *sub judice* did indeed constitute prosecutorial misconduct. *See, e.g., McGriff,* 76 Hawai'i at 160, 871 P.2d at 794 (first holding that there was no prosecutorial misconduct, then considering prejudice *arguendo* ); *State v. Lincoln,* 3 Haw.App. 107, 125, 643 P.2d 807, 820 (1982) ("Since we find that the [prose-

cutor's] comments were not improper, we need not address the question as to whether the [jury] instruction cured the problem that would have been created by an improper comment." (Footnote omitted.)).

**8.** "The test is, of course, not which side is more believable, but whether, taking all of the evidence in the case into consideration, guilt as to every essential element of the charge has been proven beyond a reasonable doubt." *United States v. Stanfield,* 521 F.2d 1122, 1125 (9th Cir.1975).

dant told the truth and all of the government witnesses lied); *People v. Hawkins,* 243 Ill. App.3d 210, 183 Ill.Dec. 421, 611 N.E.2d 1069, 1081 (1993) (it was improper for the prosecuting attorney to effectively argue that, if the jury believed the prosecution's witness it should convict, but if the jury believed the defendant it should acquit); *People v. Crossno,* 93 Ill.App.3d 808, 49 Ill. Dec. 137, 417 N.E.2d 827, 836–37 (1981) (it was improper for the prosecuting attorney to argue that, if the jury believed the defendant, it must find him not guilty, but if the jury believed the prosecution's witnesses, it must find him guilty).

▮ The DPA here did not break the bounds of legitimate argument:

[A] prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. *[State v.]Apilando,* 79 Hawai'i [128,] 141– 42, 900 P.2d [135,] 148 [(1995)] (citing *State v. Zamora,* 247 Kan. 684, 803 P.2d 568 (1990)) (other citations omitted). It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. *See, e.g., State v. Abeyta,* 120 N.M. 233, 901 P.2d 164, 177–78 (1995) (*"Where the evidence presents two conflicting versions of the same events, 'a party may reasonably infer, and thus, argue, that the other side is lying.'* " (Citations omitted.)); *Ex parte Waldrop,* 459 So.2d 959, 961 (Ala.1984) ("During closing argument, the prosecutor as well as defense counsel has a right to present his [or her] impressions from the evidence, if reasonable and may argue every legitimate inference."); *People v. Sutton,* 260 Ill.App.3d 949, 197 Ill.Dec.' 867, 876, 631 N.E.2d 1326, 1335 (1994) ("The prosecution may base its closing argument on the evidence presented or reasonable inference therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight the inconsistencies in defendant's argument.").

*State v. Clark,* 83 Hawai'i 289, 304–305, 926 P.2d 194, 209–10 (1996) (some brackets in the

original; emphasis supplied). Accordingly, we discern no prosecutorial misconduct, and hence, we may end our primary inquiry here. *See State v. Meyer,* 99 Hawai'i 168, 171, 53 P.3d 307, 310 (App.2002).

▮ But to be sure, we observe that the jury in this case was well instructed on "what [it] must find in order to reach a certain verdict." *Vargas,* 583 F.2d at 386 (citation omitted). At the beginning of jury selection, the court instructed the jury panel:

This is a criminal case and Mr. Carvalho has pled not guilty to these charges. You are to presume him innocent of these charges unless and until he's been proven guilty beyond a reasonable doubt.

During jury selection, the court reiterated and explained:

Now the presumption of innocence not only places the burden on the State of Hawaii. The burden is that they have to prove that Mr. Carvalho is guilty beyond a reasonable doubt. For now I will tell you that a reasonable doubt is a doubt in your mind about the defendant's guilt which arises from the evidence presented or from the lack of evidence and which is based upon reason and common sense. You also have to keep in mind that a doubt that is not based on the evidence presented or the lack of evidence or a doubt that is based upon imagination, suspicion, speculation, or guesswork is not a reasonable doubt.

Now you are not permitted to find the defendant guilty upon mere suspicion or upon evidence which only shows the defendant is probably guilty. What this means is that after consideration of the evidence and the law if you have a reasonable doubt of the defendant's guilt, even if you believe the defendant might be guilty or is probably guilty, it would be your duty to find the defendant not guilty. However, if, after consideration of the evidence and the law, you do not have a reasonable doubt of the defendant's guilt, then it would be your duty to find the defendant guilty.

Okay. Now in order for an individual to commit a criminal offense a person must do certain acts and have a certain state of mind when the acts are done. These acts and the state of mind are called the "ele-

ments of the offense." After the evidence has been presented the court will instruct you in detail as to the elements which make up the offense with which the defendant is charged in this case.

Before you can find the defendant guilty of an offense each of the elements which make up the offense must be proven beyond a reasonable doubt. If all the elements have been proven beyond a reasonable doubt, the defendant must be found guilty of the offenses. If all of the elements have not been proven beyond a reasonable doubt, then you must find the defendant not guilty.

And in its formal jury instructions, given just before closing arguments, the court repeated the quoted instructions, in similar words but identical substance. We presume the jury followed the court's instructions. *State v. Klinge*, 92 Hawai'i 577, 592, 994 P.2d 509, 524 (2000). *See also Meyer*, 99 Hawai'i at 172–73, 53 P.3d at 311–12 ("generally relevant jury instructions can cure improper arguments by a prosecutor; especially where, as here, such instructions were given repeatedly" (citations omitted)).

We also note that the court girded the jury against misleading statements of the attorneys. In its formal jury instructions, the court warned:

Statements or remarks made by counsel are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence.

And if this caveat was not enough, the court reiterated it before the succeeding closing arguments:

Remember, the arguments of the attorneys are not evidence. You should consider their arguments to you, but you are not bound by their recollections or interpretations of the evidence.

Here again, we presume the jury followed the court's instructions. *Klinge*, 92 Hawai'i at 592, 994 P.2d at 524. If prophylactic was necessary in this case, surely these instructions provided some good measure of inoculation. *Meyer*, 99 Hawai'i at 172–73, 53 P.3d at 311–12.

As an adjunct to his point of error on appeal, Carvalho references the following excerpt from the court's formal jury instructions: [9]

You must presume the defendant is innocent of the charges against him. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt.

Carvalho contends the DPA's purportedly improper argument

was compounded by the circuit court's failure to tell the jury that the presumption of innocence stays with the defendant through jury deliberations *unless and until* the prosecution has proved *and* the jury has found the defendant guilty beyond a reasonable doubt. For all the jury knew from the court's instruction that the "presumption remains with the defendant throughout the trial of the case," the pre-

---

9. "The standard of review for a trial court's issuance or refusal of a jury instruction is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Balanza*, 93 Hawai'i 279, 283, 1 P.3d 281, 285 (2000) (quotation [(sic)] and internal quotation marks omitted). "Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *State v. Sua*, 92 Hawai'i 61, 69, 987 P.2d 959, 967 (1999) (quoting *State v. Pinero*, 70 Haw. 509, 527, 778 P.2d 704, 716 (1989) (quotation [(sic)] omitted)). In other words,

error is not to be viewed in isolation and considered purely in the abstract. It must be examined in the light of the entire pro-

ceedings and given the effect which the whole record shows it to be entitled. In that context, the real question becomes whether there is a reasonable possibility that error may have contributed to conviction.

*Id.* (quoting *State v. Heard*, 64 Haw. 193, 194, 638 P.2d 307, 308 (1981) (citations omitted)).

Jury instructions "to which no objection has been made at trial will be reviewed only for plain error." *State v. Sawyer*, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998) (citing *Pinero*, 75 Haw. at 291–92, 859 P.2d at 1374). If the substantial rights of the defendant have been affected adversely, the error may be considered as plain error. *See id.*

*State v. Aganon*, 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (original brackets omitted).

sumption had ceased to exist once the evidence portion of the trial was completed. This is certainly the meaning conveyed in the prosecutor's improper argument, which meaning the circuit court failed to correct. Opening Brief at 8 (citations omitted; emphases in the original). Accordingly, Carvalho suggests that, "This court must join the jurisdictions that have condemned the kind of improper argument made by the prosecutor in the instant case. The court should also see that the standard criminal jury instructions are amended so that there is no ambiguity as to when the presumption of innocence falls away." Reply Brief at 3. We decline his suggestions in this case.

First, we have already decided that the DPA's remarks were not a misstatement of law. Second, the referenced jury instruction, in conjunction with the jury instructions quoted or noted above, accurately and adequately limned the presumption of innocence and its time and place. In addition, we notice the following jury instructions that directly addressed Carvalho's concerns in this regard:

> You are to keep an open mind, and please do not form or express any opinion about any issue in the case until the case is finally submitted to you.
>
> . . . .
>
> Each of you must decide the case for yourself but only after you have considered the views of your fellow jurors. Do not be afraid to change your opinion if you think you are wrong, but do not come to a decision simply because other jurors think

it is the right decision or simply to get the case over with.

Therefore, "when read and considered as a whole, the instructions given [were not] prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Aganon,* 97 Hawai'i 299, 302, 36 P.3d 1269, 1272 (2001) (citation and internal quotation marks omitted). If the proof indeed be in the pudding, we point out that the jury deliberated upon its verdicts for the better part of a day, that it asked the court for a transcript of the 911 audiotape and for clarification of *mens rea* during its deliberations, and that it ultimately convicted Carvalho not of the charged offense in count I but of an included offense. These circumstances are clearly not emblematic of a jury that was misled by the DPA and the *court into truncating the presumption* of innocence in which Carvalho was cloaked.

### III. Conclusion.

We cannot notice the plain error urged upon us in this appeal because it was not error in the first place. Accordingly, the July 7, 2003 second amended judgment of the court is affirmed, except that we *sua sponte* remand for re-sentencing for simple trespass in count II, as a violation.