926 P.2d 194

STATE of Hawai'i, Plaintiff–Appellee,

v.

Francis Eugene CLARK, Defendant–Appellant.

No. 18406.

Supreme Court of Hawai'i.

Oct. 3, 1996.

Reconsideration Denied Oct. 31, 1996.

David W. Hall, on the briefs, Honolulu, for defendant-appellant.

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, Honolulu, for plaintiff-appellee.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

MOON, Chief Justice.

Defendant-appellant Francis Eugene Clark appeals his conviction for attempted second degree murder. On appeal, Clark alleges as error: (1) the admission of extrinsic evidence of the complaining witness's prior inconsistent statements; (2) the admission of expert testimony concerning domestic violence and the phenomenon of recantation; (3) the admission of evidence regarding two prior acts of Clark's misconduct; (4) the denial of his motion for judgment of acquittal; (5) prosecutorial misconduct; and (6) ineffective assistance of counsel. For the reasons discussed below, we affirm Clark's conviction.

## I. BACKGROUND

On the morning of September 6, 1993, at approximately 6:30 a.m., a security guard at the Hawaiian Princess condominium in Mākaha telephoned the Honolulu Police Department (HPD), informing them that he had heard a female screaming in the condominium complex. HPD Officer Allan Kuaana testified that, upon arrival at the condominium complex, he observed a woman, Diana May Clark (Diana), bleeding from her chest. Officer Kuaana further testified that Diana informed him that her husband had "stabbed her in the chest." After requesting an ambulance to transport Diana to Saint Francis West Hospital, Officer Kuaana arrested Clark, Diana's husband.

Later that day, at approximately 7:15 p.m., HPD Detective Bruce Swann interviewed Diana at the hospital. During the tape recorded interview, Diana recounted the following version of the events that led to her injuries. Diana stated that, after an evening in which she and her husband both consumed a significant amount of alcohol and injected cocaine,

her husband became very angry, accusing her of being unfaithful. Diana also stated that, after a long argument, Clark ordered her into their bedroom and demanded she have sex with him. After she refused, Diana indicated that Clark "jumped on [her] and put his hand on [her] throat because [she] screamed[.]"

Diana told Detective Swann that Clark then punched her in the back, went to the kitchen, and returned to the bedroom with a knife in his hand. At that point, Clark threw her into the closet, "ripping at [her] clothes." Diana stated, "[H]e kept saying that it would be nothing for him to kill me; that he'd kill[ed] people in Vietnam." In recounting how she was stabbed, the following exchange occurred between Detective Swann and Diana:

Q. [By Detective Swann] He punched you in the back?

A. [By Diana] And then he went into the kitchen. When he came back, he had this knife—knife in his hand.

Q. Okay. Now, he comes out—he comes—Where are you in the bedroom now when he comes—

A. On the bed, on my—on the right side of the bed by the closet.

Q. Okay.

A. And—and he throws me in the closet and he's just telling me—he's ripping at my clothes.

Q. He's cutting your clothes with the knife?

A. He's cutting my robe.

Q. Your robe?

A. That's what I had on, was a green robe. And he kept saying that it would be nothing for him to kill me; that he'd kill people in Vietnam.

Q. He said it'd be nothing to kill you, that he's killed people in Vietnam. Okay, and then?

A. And I, I was begging him, please, please stop, please cause I knew he didn't know what he was doing. And all of a sudden, it went in here.

Q. 'Kay. So then he stabbed you. Okay.

A. And he pulled it out, and there was blood on it. And I said Gene, Gene, I'm hurt. I'm really hurt. I thought I was bleeding from my mouth, too.

Q. Okay. So then when he stabbed you with the knife, what hand was the knife in?

A. The right hand.

. . . .

Q. Okay. So then after that, after he stabs you, then what does he do?

A. Well, I'm in the closet. He's got me backed into the closet on—I'm on my back and I'm begging him cause I was afraid he was gonna stab me again.

On September 21, 1993, Clark was charged with attempted murder in the second degree, in violation of HRS §§ 705–500 (1993) [1] and 707–701.5(1) (1993).[2]

At trial, the prosecution first called Diana to testify regarding her recollection of the events on September 6, 1993. Diana's testimony, however, differed markedly from what she had told Detective Swann and others about the stabbing. Although Diana admitted telling Detective Swann and others that

1. HRS § 705–500 provides in pertinent part:
**Criminal attempt.** (1) A person is guilty of an attempt to commit a crime if the person:
. . . .
(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the

crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

2. HRS § 707–701.5(1), murder in the second degree, provides in pertinent part that, "[e]xcept as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person."

Clark had stabbed her, she stated at trial that her original story was "a total lie." Diana's trial testimony completely exculpated Clark for the stabbing.

Diana testified that she was a substance abuser and that, after Clark failed to comply with her instruction to secure more drugs on the night in question, she "literally went off." Diana testified that "my temper, my mouth, the dramatics, everything. I went off on my self pity, self destruction—'I might as well kill myself because I've destroyed you. I've destroyed my husband's business. I'm nothing but a junkie. I might as well die....'" Diana further testified that *she* grabbed the knife and *stabbed herself.*

Q. [By the prosecutor] What was your husband doing when you were doing that?

A. [By Diana] He was trying to get it away from me. And he—I—He was reaching for it, and I cut his hand.

Q. How did you cut his hand?

A. Well, he grabbed the blade of the knife. And then I lost my balance and I fell back into the closet and used that as—accused him of pushing me into the closet.

To impeach Diana's claim that she stabbed herself in the chest, the prosecution confronted Diana with her tape recorded statement to Detective Swann and her prior inconsistent statements to several persons who had encountered Diana on the morning of the stabbing. Diana testified that she recalled her prior statements, but that those statements were not truthful.

The prosecution also asked Diana whether she recalled two prior occasions when police were called to her home as a result of an argument between herself and Clark. In the first incident, which occurred on April 17, 1993, police were called to the Clark residence after Diana had suffered an injury during an argument with Clark. After the incident, as in the present case, Diana maintained that Clark was not responsible for the injury. At trial, when questioned about the April 17 incident, Diana explained that she and Clark had been arguing and that she had reached to push Clark, but slipped and fell.

The second incident occurred on August 8, 1993. At that time, the police were again called to the Clark residence after Diana and Clark had argued. Diana testified that Clark became very angry at her and, in his anger, caused substantial damage to their property. Diana admitted that, when the police arrived, she initially lied, telling the police that a burglar had damaged the property. Diana further testified that, only after the police questioned her story, did she admit that Clark was the person who had damaged the property. Diana explained, however, that she had lied, not to protect Clark, but to collect insurance money to finance her drug habit.

Following Diana's testimony, the prosecution elicited the testimony of (1) Officer Kuaana, (2) Wiley Brunel, M.D., (3) Rosalind Mitchell, M.D., and (4) Jasmine Klotz, a medical surgical nurse at Saint Francis Hospital, each of whom testified that, on the morning of September 6, 1993, Diana had told them that she had been stabbed by her husband. The prosecution also presented the testimony of Wendy Mow–Taira, an expert on domestic violence. Mow–Taira, whose testimony related only to women in general and who offered no opinion on Diana's relationship with Clark or her credibility, testified that—for various reasons—victims of domestic violence often recant allegations of abuse against their abusers.

Clark testified in his own defense, corroborating Diana's testimony at trial. On June 15, 1994, the jury adjudged Clark guilty of attempted murder in the second degree. On August 12, 1994, Clark was sentenced to a term of life imprisonment with the possibility of parole, and this timely appeal followed.

## II. *DISCUSSION*

On appeal, Clark alleges errors in the: (1) admission of certain evidence; (2) denial of his motion for judgment of acquittal; and (3) conduct of both the prosecutor and his own counsel, which he contends entitles him to a new trial. We discuss each of Clark's contentions below.

## A. Alleged Errors in the Admission of Evidence

### 1. Diana's Prior Inconsistent Statements

As previously indicated, Diana testified at trial that she had stabbed herself in the chest. Thereafter, the prosecutor attempted to impeach Diana's testimony and establish the fact that Diana had been stabbed by Clark. In addition to confronting Diana with her tape recorded statement to Detective Swann, the prosecution introduced extrinsic evidence of Diana's prior inconsistent statements and elicited the testimony of the individuals to whom Diana had given prior inconsistent statements. On appeal, Clark contends that, once Diana admitted making statements inconsistent with her trial testimony, "the admission of Diana's statements to others and the playing of the tape [recorded statement] were plain error and prejudicially affected [Clark's] substantial rights."

#### a. Diana's tape recorded statement

Pursuant to Hawai'i Rules of Evidence (HRE) Rule 802.1 (1993), which "provides for substantive use of most prior inconsistent witness statements[,]" *State v. Eastman,* 81 Hawai'i 131, 136, 913 P.2d 57, 62 (1996) (quoting Commentary to HRE Rule 613), Diana's tape recorded statement to Detective Swann was admitted into evidence, over Clark's objection.

HRE Rule 802.1 provides in pertinent part:

**Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial ... are not excluded by the hearsay rule:

(1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in com-

pliance with rule 613(b),[3] and the statement was:

. . . .

(C) Recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement[.]

" 'The intent [of HRS 802.1] is to include in paragraph (1) all written or recorded statements that can be fairly attributed to the witness declarant.' " *Eastman,* 81 Hawai'i at 136, 913 P.2d at 62 (quoting Commentary to HRE Rule 802.1). The *Eastman* court further stated:

The trustworthiness of statements defined in paragraph[ ] ... (C) is further assured by the requirement that the witness-declarant be "subject to cross-examination concerning the subject matter of the statement." The situation envisioned is one where the witness has testified about an event and his [or her] prior written statement also describes that event but is inconsistent with his [or her] testimony. Since the witness can be cross-examined about the event and the statement, the trier of fact is free to credit his [or her] present testimony or his [or her] prior statement in determining where the truth lies. Because the witness is subject to cross-examination, the substantive use of his [or her] prior inconsistent statements does not infringe the sixth amendment confrontation rights of accused in criminal cases, see *California v. Green,* 399 U.S. 149 [90 S.Ct. 1930, 26 L.Ed.2d 489] (1970).

*Id.* (citing to the Commentary to HRE Rule 802.1).

In order for the recorded statement of a witness to be admitted as substantive evidence of a defendant's guilt, HRE Rule 802.1(1)(C) requires the following: (1) the witness must testify about the subject matter of his or her prior statement so that the witness is subject to cross-examination concerning the subject matter of the prior state-

---

**3.** HRE Rule 613(b) provides:

Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross-examina-

tion, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

ment; (2) the witness's prior statement must be inconsistent with his or her testimony; (3) the prior inconsistent statement must be recorded in substantially verbatim fashion by stenographic, mechanical, electrical, or other means contemporaneously with the making of the statement; and (4) the prior inconsistent statement must be offered in compliance with HRE Rule 613(b), which, as previously noted, requires that, on direct or cross-examination, the circumstances of the prior inconsistent statements have been brought to the attention of the witness and that the witness has been asked whether he or she made the prior inconsistent statements. *See Eastman,* 81 Hawai'i at 137, 913 P.2d at 63 (outlining the requirements for admission of prior inconsistent statements pursuant to HRE Rule 802.1(1)(B)).

▪ The admission of Diana's prior statement to Detective Swann complied with the foregoing requirements. First, at Clark's trial, the prosecution directly examined Diana as a witness and elicited testimony from her regarding the circumstances surrounding the September 6, 1993 incident and her prior statement to Detective Swann wherein she had stated that Clark stabbed her in the chest. Such testimony, thus, made Diana subject to cross-examination concerning the subject matter of her prior statement to Detective Swann.

Second, although Diana testified at trial that the stab wound to her chest was self-inflicted, Diana alleged in her statement to Detective Swann that Clark had stabbed her in the chest. Thus, Diana's statement to Detective Swann was inconsistent with her testimony. Third, the record shows that Diana's statement to Detective Swann was recorded in substantially verbatim fashion on audio tape, and Diana, at trial, acknowledged that she had given a recorded statement to Detective Swann. Finally, after Diana testified on direct examination by the prosecution that the stab wound to her chest was self-inflicted, the prosecutor brought to Diana's attention the circumstances of her statement to Detective Swann. At that point, Diana admitted making the statement, but testified that her prior inconsistent statement was "a total lie." Thus, Diana's prior inconsistent

statements to Detective Swann were offered in compliance with HRE Rule 613(b).

Under cross-examination by Clark's counsel, Diana explained that her prior inconsistent statements were not true because she (1) does not "take responsibility for anything" and (2) was "strung out" on drugs at the time. Diana's cross-examination satisfied constitutional and trustworthiness concerns over admitting into evidence her prior inconsistent statements to Detective Swann because it afforded Clark the opportunity to have Diana fully explain to the trier of fact why her in-court and out-of-court statements were inconsistent, which, in turn, enabled the trier of fact to determine where the truth lay. *See Eastman,* 81 Hawai'i at 139, 913 P.2d at 65. We therefore hold that the trial court did not err in admitting Diana's tape recorded statement to Detective Swann as substantive evidence of Clark's guilt.

### b. *Diana's statements to police and medical personnel*

In response to the prosecutor's questions on direct examination, Diana testified that she had spoken with Officer Kuaana when he arrived at the condominium complex and told the officer that Clark had cut her with a knife and had pushed her. Diana contended, however, that what she told Officer Kuaana was untruthful.

When asked by the prosecutor what she had stated to the medical personnel who treated her, Diana admitted that she also told the medical personnel that Clark had stabbed her, but explained that by then she was "on a roll of keeping this accusation alive about [Clark]" and was therefore not being truthful.

▪ Clark failed to object to the introduction of extrinsic evidence of Diana's prior inconsistent statements, namely, the testimony of Officer Kuaana, Drs. Brunel and Mitchell, and Nurse Klotz. In *State v. Wallace,* 80 Hawai'i 382, 910 P.2d 695 (1996), we explained that

"[i]t is the general rule that evidence to which no objection has been made may properly be considered by the trier of fact and its admission will not constitute

ground for reversal. It is equally established that an issue raised for the first time on appeal will not be considered by the reviewing court. Only where the ends of justice require it, and fundamental rights would otherwise be denied, will there be a departure from these principles. [Hawai'i Rules of Penal Procedure (HRPP) ] Rule 52(b) (1994)...."

*Id.* at 410, 910 P.2d at 723 (quoting *State v. Naeole*, 62 Haw. 563, 570–71, 617 P.2d 820, 826 (1980)). HRPP Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Clark contends that the admission of the extrinsic evidence of Diana's prior inconsistent statements should have been accompanied by "instructions limiting their purpose to impeachment." HRE Rule 613(b) (1993) governs the use of extrinsic proof or prior inconsistent statements for the purpose of impeaching a witness. As previously noted, HRE Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a witness is not admissible, unless, on direct or cross-examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement." If, as Clark contends, the extrinsic evidence concerning Diana's prior inconsistent statements was admissible only for purposes of impeachment, then the failure to instruct the jury that the evidence was not to be considered as substantive evidence of Clark's guilt may have been error.

■ HRE Rule 105 (1993) provides that, "[w]hen evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Clark argues that, because Diana's prior inconsistent statements constituted hearsay, the jury should have been instructed that it was to consider the statements for impeachment purposes only. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial ..., offered in evidence to prove the truth of the matter asserted,"

HRE Rule 801(3) (1993), and "[h]earsay is not admissible at trial unless it qualifies as an exception to the rule against hearsay." *Eastman*, 81 Hawai'i at 136, 913 P.2d at 62; *see also* HRE Rule 802 (1993) ("Hearsay is not admissible except as provided by these rules, or by other rules prescribed by the Hawaii supreme court, or by statute."). For the reasons discussed below, we believe that Diana's prior inconsistent statements to the police and medical personnel qualify as excited utterances and were thus admissible as substantive evidence of Clark's guilt without a limiting instruction.

HRE Rule 803 (1993) provides in pertinent part:

The following are not excluded by the hearsay rule, even though the declarant is available as a witness:

. . . .

(b) Other exceptions.

. . . .

(2) Excited utterance. A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition.

■ In *State v. Moore*, 82 Hawai'i 202, 921 P.2d 122 (1996), we explained that:

"The assumption underlying [the excited utterance] exception is that a person under the sway of excitement precipitated by an external startling event will not have the reflective capacity essential for fabrication and that, consequently, any utterance will be spontaneous and trustworthy." 4 J.B. Weinstein & M.A. Berger, *Weinstein's Evidence,* ¶ 803(2)[01], at 803–101 (1994). "[L]ack of capacity to fabricate, rather than lack of time to fabricate is the justification for this rule." *Id.* at 803–105.

The basis for the "excited utterance" exception, ... is that such statements are given under circumstances that eliminate the possibility of fabrication, coaching, or confabulation, and that therefore the circumstances surrounding the making of the statement provide sufficient assurance that the statement is trustworthy and that cross-examination would be superfluous.

*Idaho v. Wright,* 497 U.S. 805, 820 [110 S.Ct. 3139, 111 L.Ed.2d 638] (1990) (citations omitted).

Three foundational requirements are imposed by HRE Rule 803(b)(2) and recognized by courts applying identical rules. The proponent of the statement must establish that: (1) a startling event or condition occurred; (2) the statement was made while the declarant was under the stress of excitement caused by the event or condition; and (3) the statement relates to the startling event or condition. *See, e.g., United States v. Sowa,* 34 F.3d 447, 452–53 (7th Cir.1994); *United States v. Moore,* 791 F.2d 566, 570 (7th Cir.1986); *State v. Whalen,* 520 N.W.2d 830, 831–32 (N.D. 1994); *State v. McLaughlin,* 642 A.2d 173, 175 (Me.1994); *see also* 2 *McCormick on Evidence* § 272 at 215–16 (4th ed.1992); M.H. Graham, *Federal Practice and Procedure* § 6753 at 571 (interim ed.1992). *Moore,* 82 Hawai'i at 218–19, 921 P.2d at 138–39.

In this case, the prosecution clearly established that "a startling event or condition occurred," that is, that Diana suffered a life-threatening stab wound to her chest, and that the statements made by Diana to the police and medical personnel clearly related to the startling event. Thus, the first and third foundational requirements were satisfied. Our inquiry therefore focuses on "the second and most crucial requirement— whether the statement was made under the stress of excitement caused by the startling event or condition." *Moore,* 82 Hawai'i at 219, 921 P.2d at 139.

■ " 'In all cases, the ultimate question is whether the statement was the result of reflective thought or whether it was rather a spontaneous reaction to the exciting event.' " *Moore,* 82 Hawai'i at 219, 921 P.2d at 139 (quoting 2 *McCormick on Evidence* § 272 at 218). In considering whether a statement was made under the stress of excitement, we explained in *Moore* that, in addition to the elapsed time between the startling event and the statement, courts consider "the nature of the event, the age of the declarant, the influences of intervening occurrences, and the nature and circumstances of the statement

itself." *Moore,* 82 Hawai'i at 221, 921 P.2d at 141 (citations omitted).

### i. Diana's statements to Officer Kuaana

Officer Kuaana testified that, when he arrived at the condominium complex, just minutes after the stabbing, Diana was "crying, holding her upper left chest area" and that he could see blood on Diana's gown and her right hand. After informing Officer Kuaana that she needed to go to the hospital, Diana stated that she and Clark had gotten into an argument, during which Clark "punched her in the back with a closed fist[,] grabbed her by the clothes[,] grabbed a kitchen knife, then he stabbed her in the chest." Officer Kuaana further testified that, when Diana made these statements, "[s]he was really shaken. It was obvious she was scared, terrified. She was trembling. She was just starting to cry. She couldn't really say much more after that."

### ii. Diana's statements to Doctors Brunel and Mitchell

Dr. Brunel, the attending emergency room physician at St. Francis West Medical Center on September 6, 1993, testified that, when he treated Diana for her injuries, she appeared to him to be "distressed" and in pain. He related that Diana informed him that her husband had stabbed her in her chest. Similarly, Dr. Mitchell, who treated Diana in the St. Francis emergency room approximately an hour after the stabbing, testified that Diana was crying and "terribly frightened. She was very agitated, very nervous. She presented as if she had been extremely traumatized. She was very jumpy when you approached her, afraid to let you touch her, extremely fearful from the moment she entered the department and through her course there. Just stating over and over that she was very very frightened."

Under the totality of the circumstances, particularly the violent nature of the startling event and the severity of Diana's injuries (Dr. Mitchell testified that Diana's injuries were life-threatening), we hold that Diana's statements to Officer Kuaana, Dr. Brunel, and Dr. Mitchell were made while under the

stress of excitement caused by the stabbing and were not the product of reflective thought. The three foundational requirements of HRE 803(b)(2) having been met, we further hold that Diana's statements to Officer Kuaana, Dr. Brunel, and Dr. Mitchell were admissible as substantive evidence of Clark's guilt under the hearsay exception for excited utterances and not subject to a limiting instruction.

### iii. Diana's statement to Nurse Klotz

Unlike the statements made to Officer Kuaana and Drs. Brunel and Mitchell, Diana's statements to Nurse Klotz present a close question. Nurse Klotz testified that (1) she had treated Diana approximately three hours after the stabbing, (2) Diana was crying, and (3) Diana had informed her that her husband had stabbed her in the chest. However, Nurse Klotz further testified that Diana appeared "alert and oriented."

█ We need not decide, however, whether Diana's statements to Nurse Klotz qualify as excited utterances because, even if we were to assume that the stress of excitement caused by the stabbing had dissipated by the time Diana spoke with Nurse Klotz, any error in the admission of Nurse Klotz's testimony was harmless. Because we hold that Diana's statements to Officer Kuaana, Dr. Brunel, and Dr. Mitchell were properly presented to the jury, Nurse Klotz's testimony was merely cumulative.

### 2. Testimony of Wendy Mow–Taira

█ At trial, the circuit court qualified Wendy Mow–Taira, Executive Director of the Hawaii Crises Shelter, Inc., as an expert in domestic violence. Mow–Taira, who had not interviewed either Diana or Clark and who testified that she was entirely unfamiliar with the facts underlying Clark's prosecution, offered no opinion on whether Diana was a victim of domestic violence or whether Diana's trial testimony was credible; rather, she testified with respect to domestic violence and domestic violence victims generally. In particular, Mow–Taira testified that it is not uncommon for victims of domestic violence to recant allegations of abuse after they have been victimized in order to protect

the abuser. Mow–Taira's testimony thus offered the jury a possible explanation for Diana's recantation.

Expert testimony in Hawai'i is governed by HRE Rule 702, which provides:

> **Testimony by experts.** If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise. In determining the issue of assistance to the trier of fact, the court may consider the trustworthiness and validity of the scientific technique or mode of analysis employed by the proffered expert.

"Expert testimony assists the trier of fact by providing a resource for ascertaining truth in relevant areas outside the ken of ordinary laity." *State v. Batangan*, 71 Haw. 552, 556, 799 P.2d 48, 51 (1990) (Citation and quotation marks omitted).

On appeal, Clark terms Mow–Taira's testimony "junk science." Furthermore, Clark complains that, because there was no "evaluation of Diana by a qualified expert to determine if Diana was suffering from a recognized diagnosis of some sort of domestic violence victim's syndrome, her testimony was nothing more than unproved generalizations which served only to suggest to the jury that it should speculate as to whether or not Diana would lie under oath because she was a victim of domestic violence."

Contrary to Clark's contention, Mow–Taira's testimony is not "junk science." Substantially similar testimony was presented in *State v. Cababag*, 9 Haw.App. 496, 850 P.2d 716, *cert. denied*, 74 Haw. 652, 853 P.2d 542 (1993). In *Cababag*, the defendant was convicted of abuse of family and household members. The victim in that case, the defendant's live-in girlfriend, told the police on the day of the incident that the defendant had beaten her. The victim repeated her allegation in a written statement made that same day. At trial, the victim "admitted to being visited by the police on the morning of [the incident], being contacted by the police that

afternoon, and writing and signing her statement, but testified that she 'made up' the story she told in her written statement." *Id.* at 500–01, 850 P.2d at 719. Over defendant's objection, the trial court then permitted an expert in domestic violence to testify that victims of domestic violence commonly recant their allegations against their abuser.

On appeal, the Intermediate Court of Appeals held:

> At the trial of an alleged male batterer of a woman with whom he is living, where the woman recants her pretrial accusations that she was battered by the male, an expert's testimony that one reasonable explanation for the recantation is the battered housemate/spouse syndrome is relevant specialized knowledge that was unknown to the average juror and will aid the average juror in determining the credibility of the woman's testimony.

*Id.* at 496–97, 850 P.2d at 716. Clark makes no attempt to distinguish *Cababag* and, accordingly, we hold that Mow–Taira was properly allowed to testify regarding the effects of domestic violence and, in particular, that victims of domestic violence often recant allegations of abuse.

 Clark's contention that Mow–Taira's testimony regarding the recantation phenomenon of domestic violence was irrelevant, absent a determination by an expert that Diana was in fact suffering from symptoms associated with domestic violence, is similarly without merit. Expert testimony regarding the effects of domestic violence and how it may explain a victim's recantation of abuse

> is *not* evidence that the victim suffers from a specific medical or psychological condition—or even that the victim's behavior as observed by the experts was consistent with the behavior of women suffering from such a condition. It is simply testimony, based on the witnesses' experience in cases of domestic violence, that women with a history of domestic abuse often exhibit common traits, among them denial and a tendency to recant accusations of abuse.

*State v. Schaller*, 544 N.W.2d 247, 253 (Wis. Ct.App.1995), *review denied by, State v. Schaller*, 546 N.W.2d 469 (Wis.1996). In the present case, therefore, it was appropriately left to the jury to determine whether Diana's behavior was consistent with the behavior described by Mow–Taira.

### B. Evidence of Clark's Prior Acts of Violence

As previously stated, police were called to the Clark residence on April 17, 1993, after Diana suffered an injury during an argument with Clark. Diana subsequently maintained, as she does in this case, that Clark was not responsible for the injury. The second incident occurred on August 8, 1993, when the police were again called to the Clark residence after Diana and Clark had argued. On that date, Clark had become violent during the argument with Diana, causing substantial damage to their property. Diana initially lied to the police, telling them that a burglar had damaged the property; however, she later admitted that Clark had damaged the property after the police challenged her story.

Clark contends that the trial court erred in allowing the prosecution to question Diana regarding these two prior incidents, arguing that those events should have been precluded under HRE Rule 404(b) or Rule 403.

HRE Rule 404(b) provides:

> **Other crimes, wrongs, or acts.** Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible where such evidence is probative of another fact that is of consequence to the determination of the action, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial. In criminal cases, the proponent of evidence to be offered under this subsection shall provide reasonable notice in advance of trial, or during trial if the court

excuses pretrial notice on good cause shown, of the date, location, and general nature of any such evidence it intends to introduce at trial.

HRE Rule 403 provides:

**Exclusion of relevant evidence on grounds of prejudice, confusion, or waste of time.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

In *State v. Pinero,* 70 Haw. 509, 778 P.2d 704 (1989), we stated:

[HRE] 404(b) prevents the introduction of "[e]vidence of other crimes, wrongs, or acts ... to prove the character of a person in order to show that he [or she] acted in conformity therewith." The framers of the rule recognized that such evidence "tends to distract the trier of fact from the main question of what actually happened on the particular occasion." [HRE] 404, Commentary (quoting Federal Rules of Evidence (Fed.R.Evid.) 404 advisory committee's note). "It ... permits the trier ... to reward the good [person] and to punish the bad [person] because of their respective characters despite what the evidence in the case shows actually happened." *Id.* [HRE] 404(b) thus codifies the common law rule "that the prosecution may not introduce evidence of other criminal acts of the accused unless the evidence is introduced for some purpose other than to suggest that because the defendant is a person of criminal character, it is more probable that he [or she] committed the crime for which he [or she] is on trial." E.W. Cleary, *McCormick on Evidence* § 190, at 557–58 (3d ed.1984) (footnotes omitted). . . .

Evidence of other crimes, wrongs, or acts "may, however, be admissible where [it] is probative of any other fact that is of consequence to the determination of the [case], such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident." [HRE] 404(b). But its acknowledged tendency to distract the trier of fact compels the trial court to weigh the evidence and to exclude it "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." [HRE] 403.

*Id.* at 517–18, 778 P.2d at 710 (some brackets in original).

In *State v. Castro,* 69 Haw. 633, 756 P.2d 1033 (1988), we explained that,

when evidence of other crimes, wrongs, and acts is offered by the prosecution, the problem for the trial court is one "of classifying and then balancing[, if necessary]." If its purpose is only "to show some propensity to commit the crime at trial, there is no room for ad hoc balancing. The evidence is then unequivocally inadmissible[.]" If it is probative of any other fact of consequence in the determination of the case, the court must then consider whether the prejudicial impact of the evidence would be substantially greater than its probative worth.

*Id.* at 644, 756 P.2d at 1042 (quoting E.W. Cleary, *McCormick on Evidence* § 190 (3d ed.1984)); *see also State v. Renon,* 73 Haw. 23, 32, 828 P.2d 1266, 1270 (1992) ("[T]he court must first determine if the evidence of other crimes, wrongs or acts is relevant and 'probative of any other fact that is of consequence to the determination of the action, such as motive, opportunity, intent, preparation, plan, knowledge, identity, modus operandi, or absence of mistake or accident.' HRE 404(b). If such evidence is determined to be relevant, the court must then balance the probative value of the relevant evidence against its prejudicial impact. Rule 403." (footnote omitted)).

### 1. Relevancy of the Evidence

The list of permissible purposes in Rule 404(b) is not intended to be exhaustive "for the range of relevancy outside the ban is almost infinite." E.W. Cleary, *McCormick on Evidence* § 190, at 448 (Cleary ed.1972). In *United States v. Miller,* 895 F.2d 1431

(D.C.Cir.1990), *cert. denied,* 498 U.S. 825, 111 S.Ct. 79, 112 L.Ed.2d 52 (1990), the United States District Court of Appeals for the District of Columbia explained:

> [Rule 404(b) ] was intended not to define the set of permissible purposes for which bad-acts evidence may be admitted but rather to define the *one impermissible* purpose for such evidence. 'Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a [person] who commits a crime probably has a defect of character; a [person] with a defect of character is more likely than [people] generally to have committed the act in question.' 2 J. Weinstein & M. Berger ¶ 404(8) at 404–52. In other words, under Rule 404(b), *any* purpose for which bad-acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character. The Government's right to introduce bad-acts evidence for purposes other than showing a defendant's criminal propensity is by no means unlimited. But the limits derive from the 'general strictures limiting admissibility such as Rules 402 and 403,' not from Rule 404(b). *Huddleston [v. United States,* 485 U.S. 681, 688], 108 S.Ct. [1496] at 1500[, 99 L.Ed.2d 771 (1988)].

*Id.* at 1436.

In this case, the prosecution contends that:

> The testimony [regarding the two prior incidents] was relevant to establish that [Diana], as an individual in an abusive relationship, could be expected to protect [Clark] by taking blame for the injuries she suffered as a result of the attack at issue in the instant matter. The testimony regarding the incident on August 8th, also demonstrated [Diana's] tendency to take the blame to protect [Clark].

> That [Diana] would take the blame to protect [Clark] appears to be a characteristic common to individuals in abusive domestic relationships. The inquiry into the circumstances of the two prior incidents was only part of the testimony the prosecutor sought to elicit to establish that as a victim of domestic violence, [Diana] would recant her earlier statement that [Clark] had stabbed her and blame herself to protect him.

The prior incidents of domestic violence between Diana and Clark showed the jury the context of Diana's relationship with Clark. The context of Diana's relationship with Clark was relevant because the relationship was offered as the basis for Diana's recantation at trial.

In *State v. Thompson,* 520 N.W.2d 468 (Minn.Ct.App.1994), defendant was charged with sexual assault for having inserted a metal hanger into his girlfriend's rectum and vagina. Within two days following the incident, the victim told her roommate, her sister, at least two police officers, and a domestic abuse counselor that the defendant had sexually assaulted her. *Id.* at 470. However, a few days after the incident, the victim "told her sister that she had lied about the assault, that she had used the hanger on herself, and that she did not want [defendant] to go to prison because of her false allegations." *Id.* The prosecution refused to drop the charges, "basing its case on [the victim's] original statements and evidence that a battered woman often recants truthful accusations she has previously lodged against her abuser." *Id.* In addition, at trial, "a police officer was allowed to testify that . . . [defendant] had threatened [the victim] and her mother." *Id.* Defendant was convicted following a jury trial.

On appeal, the Minnesota Court of Appeals approved of the trial court's admission of evidence that defendant had previously threatened the victim and her mother. The court explained:

> Evidence of other acts or wrongs is not admissible to prove a person's character. Minn.R.Evid. 404(b). It is admissible, though, if relevant, *to show the relationship between the defendant and the victim. State v. Thieman,* 439 N.W.2d 1, 6 (Minn. 1989) (prior threat admissible to show strained relationship); . . .

> In this case, the evidence was introduced to show Thompson's relationships with [the victim] and her mother, and it was *relevant because the state claimed those relationships were the basis for [the victim's] retraction of her allegations.* The trial court

did not abuse its discretion by allowing the evidence.

*Id.* at 471 (emphases added).

In *Smith v. State*, 669 A.2d 1 (Del.1995), the prosecution charged defendant with forcing his fiance to have intercourse. Following the incident, the victim told the police officers who responded to her 911 call and the doctor who treated her at the hospital that defendant had forced her to have intercourse. At trial, however, the victim admitted arguing and fighting with defendant on the night in question, but "denied having been raped. [Victim] explained that, when she spoke to the police on [the date of the incident,] she was angry, tired and upset. [Victim] testified that she exaggerated a lot about what had happened because she wanted the police to remove [defendant] from the apartment." *Id.* at 3.

To refute the victim's testimony, the prosecution sought the admission in evidence of several prior violent episodes between the defendant and the victim.

> The [prosecution] argued that the repeated acts of violence established a course of conduct that helped prove [the victim's] lack of consent to sexual intercourse. In addition, the fact that [the victim] was enduring an abusive relationship helped explain why, as the [prosecution] correctly anticipated, she would recant her prior statements and testify that the sexual relations were consensual. The trial judge agreed and allowed the [prosecution] to ask [the victim] about five other incidents where [defendant's] conduct resulted in [the victim] calling the police, going to a hospital emergency room for treatment, or both.

*Id.* at 5. On appeal, the Delaware Supreme Court found no abuse of discretion by the trial judge, noting that the evidence was "material [and] introduced for a proper purpose[.]" *Id.*

In accordance with the foregoing authority, we hold that, where a victim recants allegations of abuse, evidence of prior incidents of violence between the victim and the defendant are relevant to show the trier of fact the context of the relationship between the victim and the defendant, where, as here, that relationship is offered as a possible explanation for the victim's recantation.

## 2. HRE 403 Balancing Test

■ However, as previously stated, once the evidence of prior bad acts is determined to be relevant, "the court must then balance the probative value of the relevant evidence against its prejudicial impact." *Renon*, 73 Haw. at 32, 828 P.2d at 1270 (citing HRE 403) (footnote omitted). With regard to whether Diana's testimony concerning the prior incidents was more probative than prejudicial, the trial court stated that, "under the circumstances of a complaining witness who is recanting an original statement, the [c]ourt has made a determination that for these purposes, the probative value [of the prior instances of domestic discord] far outweighs any prejudice that may result as a consequence of introducing this evidence."

We have stated that "the determination of the admissibility of relevant evidence under HRE 403 is eminently suited to the trial court's exercise of its discretion because it requires a cost-benefit calculus and a delicate balance between probative value and prejudicial effect[.]" *Sato v. Tawata*, 79 Hawai'i 14, 19, 897 P.2d 941, 946 (1995) (internal quotation marks omitted) (citing *Kealoha v. County of Hawaii*, 74 Haw. 308, 315, 844 P.2d 670, 674 (1993) (quoting *Kaeo v. Davis*, 68 Haw. 447, 454–55, 719 P.2d 387, 392 (1986))).

In arguing that evidence concerning his prior misconduct should have been precluded, Clark relies upon *Castro*. In *Castro*, a jury convicted the defendant of attempted murder and assault in the first degree. At trial, the court allowed the victim, the defendant's former girlfriend, to recount "prior incidents where [the defendant] slapped her, punched her, threatened her while wielding a knife, held a gun to her head, raped her, and threatened her on the telephone[.]" *Id.* at 641, 756 P.2d at 1039–40. The trial court concluded that such evidence was admissible, pursuant to Rule 404(b), stating that the evidence "was relevant in the establishment of intent, preparation, plan, knowledge, and modus operandi and the probative value was

much greater than the prejudicial impact." *Id.* at 644, 756 P.2d at 1041–42.

On appeal, this court determined that the trial court had abused its discretion in permitting inquiry into the prior acts of violence between the victim and the defendant because the record demonstrated that the defendant did not dispute that he stabbed his ex-girlfriend. In fact, defendant testified that "he knew what was happening but just 'couldn't stop.'" *Id.* at 639, 756 P.2d at 1039. Because identity was not at issue, we deemed unpersuasive the trial court's suggestion that the evidence was relevant to prove preparation, plan, and modus operandi, recognizing that each of these Rule 404(b) acceptable purposes ultimately go to the element of identity.

 Although we recognize that identity is not an issue in this case, *Castro* nevertheless "underscores the importance of the need factor"[4] when weighing probative value versus prejudicial effect under Rule 404(b). A. Bowman, *Hawai'i Rules of Evidence Manual* 112 (1990). The *Castro* court's emphasis on the need for the evidence warrants the admission of the evidence at issue in the present case. Here, the incidents of Clark's prior violence and Diana's behavior were admissible to show the trier of fact Diana's relationship with Clark, where that relationship was offered to explain a central fact of consequence—Diana's recantation. Accordingly, we agree with the trial court's determination that the probative value of the prior incidents of domestic violence "far outweights any prejudice that may result as a consequence of introducing this evidence."

 We therefore hold that, where the complaining witness recants his or her pretrial accusation against the defendant, evidence of prior acts of domestic violence involving the complaining witness and the defendant is admissible, subject to the HRE 403 balancing test, to show the jury the context of the relationship between the victim and the defendant, where the relationship is offered as a possible explanation for the complaining witness's recantation at trial.

### C. *Motion for Judgment of Acquittal*

Clark also contends that the trial court erred in denying his motion for judgment of acquittal. Essentially, Clark maintains that Diana's recantation of her complaint against Clark warranted dismissal of the case. Specifically, Clark argues that, "[w]hen [Diana] testified at trial, she was sober, testifying under penalty of perjury and admitting that she had committed the crime of making false reports to law enforcement authorities. At the time she made her [prior inconsistent] statements ..., she testified that she was high and attempting to transfer blame and get more drugs."

The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the trier of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt. An appellate court employs the same standard of review.

*State v. Pone,* 78 Hawai'i 262, 265, 892 P.2d 455, 458 (1995) (citation and internal brackets omitted).

 Contrary to Clark's assertion, Diana's recantation at trial did not warrant a judgment of acquittal; the jury was free to discredit Diana's recantation and determine that the truth lay in her prior inconsistent statements made on the day of the stabbing. As we have often stated, "[i]t is for the ... fact finder to assess the credibility of witnesses and to resolve all questions of fact; the [finder of fact] may accept or reject any witness's testimony in whole or in part."

---

4. In *Castro,* the court stated that,

 [i]n deciding whether the danger of unfair prejudice and the like substantially outweighs the incremental probative value, a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, *the need for the evidence,* the efficacy of alternative proof, and the degree to which the evidence probably will arouse the jury to overmastering hostility.

 *Castro,* 69 Haw. at 644, 756 P.2d at 1041 (emphasis added) (citing E.W. Cleary, *McCormick on Evidence* § 190 (3d ed. 1984)).

*Eastman,* 81 Hawai'i at 139, 913 P.2d at 65. Thus, viewing the trial record in the light most favorable to the prosecution, we hold that a reasonable trier of fact could fairly conclude, beyond a reasonable doubt, that the prosecution had proved that Clark "[i]ntentionally engage[d] in conduct which ... constitute[d] a substantial step in a course of conduct intended or known to culminate in[,]" HRS § 705–500, "the death of another person." HRS § 707–701.5(1). Accordingly, we discern no error on the part of the trial court in denying Clark's motion for judgment of acquittal.

### D. *Prosecutorial Misconduct*

 Clark alleges several instances of prosecutorial misconduct purportedly necessitating reversal of his conviction. "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (citation omitted).

 Clark contends that it was inappropriate for the prosecutor to have commented during closing argument that, "[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just—it's a cockamamie[5] story and it's asking you to take yourselves as fools." We note, however, that defense counsel did not object to the

prosecutor's remarks. Therefore, we must determine whether the prosecutor's comment was improper and, if so, whether such misconduct constituted plain error that affected Clark's substantial rights. *State v. Marsh,* 68 Haw. 659, 661, 728 P.2d 1301, 1302 (1986) (citing HRPP Rule 52(b)).

 It is generally recognized under Hawai'i case law that prosecutors are bound to refrain from expressing their personal views as to a defendant's guilt or the credibility of witnesses. *Id.; see also State v. Ganal,* 81 Hawai'i 358, 376, 917 P.2d 370, 388 (1996); *but see State v. Apilando,* 79 Hawai'i 128, 141–42, 900 P.2d 135, 148–49 (1995) (prosecutor's closing remark that, because defendant had the highest stake in the outcome of the case, she had the greatest motive to lie was permissible attack on defendant's credibility). The rationale expressed by this court for this prohibition is that a prosecutor's "improper suggestions, insinuations, and especially assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Marsh,* 68 Haw. at 661, 728 P.2d at 1302 [6] (quoting *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

 However, a prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. *Apilando,* 79 Hawai'i at 141–42, 900 P.2d at 148 (citing *State v. Zamora,* 247 Kan. 684, 803 P.2d 568 (1990)) (other citations omitted). It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence. *See, e.g., State v. Abeyta,* 120 N.M. 233, 901 P.2d 164, 177–78 (1995)

---

**5.** The word "cockamamie" is a slang term defined as ridiculous, ludicrous or nonsensical. *The American Heritage Dictionary* 287 (2d College ed.1982).

**6.** We note that, in *Marsh,* the prosecutor, during closing argument, repeatedly expressed her personal opinion regarding the defendant's guilt, stating: "Ladies and gentlemen, I feel it is very clear and I hope you are convinced, too, that the person who committed this crime was none other than Christina Marsh.... I'm sure she committed the crime." 68 Haw. at 660, 728 P.2d at

1302. The prosecutor also stated, in reference to Marsh's testimony: "Use your common sense, ladies and gentlemen. That is not true. It's another lie. It's a lie, ladies and gentlemen, an out-and-out lie." *Id.* The prosecutor expressed, on nine different occasions, her belief that defense witnesses also had lied. *Id.* The commentary on the evidence by the prosecutor in this case is clearly distinguishable from the expressions of personal opinion by the prosecutor in *Marsh.*

("Where the evidence presents two conflicting versions of the same events, 'a party may reasonably infer, and thus, argue, that the other side is lying.'" (Citations omitted.)); *Ex parte Waldrop,* 459 So.2d 959, 961 (Ala. 1984) ("During closing argument, the prosecutor as well as defense counsel has a right to present his [or her] impressions from the evidence, if reasonable and may argue every legitimate inference."); *People v. Sutton,* 260 Ill.App.3d 949, 197 Ill.Dec. 867, 876, 631 N.E.2d 1326, 1335 (1994) ("The prosecution may base its closing argument on the evidence presented or reasonable inference therefrom, respond to comments by defense counsel which invite or provoke response, denounce the activities of defendant and highlight the inconsistencies in defendant's argument.").

In the present case, conflicting evidence was presented to the jury concerning Clark's drug usage, hours before the incident. On the one hand, Diana told Detective Swann, twelve hours after the stabbing, that she and Clark ingested two one-half gram packets of cocaine. On the other hand, Clark denied using drugs, but testified: (1) to his familiarity with drugs, admitting that he "[knew] where to look, in order to purchase them"; (2) that he was with his wife the previous evening when she purchased and used cocaine; and (3) later in the evening, he attempted to purchase more cocaine for her. Based on the conflicting testimony, the prosecutor argued "[w]hen the defendant comes in here and tells you that he was not on cocaine that night, that just—it's a cockamamie story[.]"

■ Several courts have upheld the use of a similar slang—"cock-and-bull" story [7]— by the prosecutor during closing argument in reference to a criminal defendant's defense. These cases illustrate that, as in the present case, the use of the slang term, if supported by the evidence, is not improper argument. For example, in *People v. Charles,* 58 Mich. App. 371, 227 N.W.2d 348 (1975), during closing argument in the defendant's murder trial, the prosecutor referred to the defendant's account of how he came into posses-

sion of the decedent's car as a "cock-and-bull story." The prosecutor also remarked "that the defendant, to put it bluntly, he's lying to you." The court, in deciding that the remark was not improper, held that, "[w]hile the prosecutor could have conveyed the underlying idea to the jury in more prosaic terms and hence avoided any semblance of impropriety, the language that he chose to employ did not exceed permissible limits of prosecutorial responsibility." *Id.* 227 N.W.2d at 357.

Also, in *State v. Weaver,* 912 S.W.2d 499 (Mo.1995), during the closing remarks in the defendant's murder trial, the prosecutor called the defendant's misidentification defense a "cock and bull story" and a "smokescreen," referred to the defendant as a liar, stated that defense counsel was "bold," and questioned the credibility and motives of several defense witnesses. *Id.* at 513. The Missouri Supreme Court upheld these comments as "well within the range of the prosecutor's adversarial responsibilities" because they pointed to inconsistencies in testimony offered by the defendant. *Id.* Specifically, the court stated:

> Comments to the effect that a defendant or a defense witness were lying have repeatedly been upheld. A prosecuting attorney may comment on the evidence and the credibility of witness[es] and, in the process, may belittle and point to the improbability and untruthfulness of specific testimony. Here the comments on the testimony of the witnesses were well within the range of the prosecutor's adversarial responsibilities in making closing argument.

*Id.* (citation omitted). *See also State v. Vitale,* 801 S.W.2d 451, 457 (Mo.Ct.App.1990) (prosecutor's characterization of defense witnesses' account of the events as "cock and bull story" was permissible inference clearly drawn from the inconsistencies in their testimony); *People v. Smith,* 122 Mich.App. 106, 332 N.W.2d 428, 430 (1982) (prosecutor's reference to Charles Manson during closing argument and statement characterizing the defendant's testimony that "I would submit to you that that would be insulting your intelli-

7. "Cock-and-bull," like cockamamie, is defined as an absurd or highly improbable tale being passed off as true. *The American Heritage Dictionary* 287 (2d College ed.1982).

gence and it's clearly a cock and bull story" upheld because prosecutor was "commenting only on the strength of his case"); *McGee v. Commonwealth,* 395 S.W.2d 378, 380 (Ky. 1965) (prosecutor's statement that the defendant "came in here with a cock and bull story that it was an accident and expected the jury to let him off" was permissible and warranted by the evidence).

■ Based upon the evidence in the present case and the context in which the phrase "cockamamie story" was utilized, we conclude that the prosecutor was well within the limits of propriety to infer, and indeed argue, that Clark's denial of drug usage was improbable, untruthful, and, in short, a "cockamamie story." Accordingly, we hold that there was no misconduct on the part of the prosecutor in this case. Consequently, we do not reach the question of plain error.

### E. *Ineffective Assistance of Counsel*

Finally, Clark contends that he received ineffective assistance of counsel. We disagree.

When an ineffective assistance of counsel claim is raised, the question is: "When viewed as a whole, was the assistance provided to the defendant 'within the range of competence demanded of attorneys in criminal cases?'" Additionally,

the defendant has the burden of establishing ineffective assistance of counsel and must meet the following two-part test: 1) that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence; and 2) that such errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense.

*State v. Silva,* 75 Haw. 419, 439–440, 864 P.2d 583, 593 (1993) (citations and internal brackets omitted).

■ Clark makes several contentions concerning his ineffective assistance of counsel claim, but he includes only one citation to the record.[8] To support his claim that de-

fense counsel was unfamiliar with the facts of the case, Clark objects to defense counsel's opening statement to the jury. During her opening statement, defense counsel attempted to provide the jury with a short summation of the essence of the dispute between Clark and Diana, stating:

Good morning, ladies and gentlemen. This is not a case of attempted murder. What this is about ... is a case about a pack of cigarettes.

Let me tell you what happened on September 5th, and September 6th.

Defense counsel then recounted the events leading up to the stabbing, which version mirrored Clark's recollection. Defense counsel stated:

What happened that night was that Mr. Clark went out twice to get cocaine for Diana. Diana had used all of it the second time around. She wanted him to go out for more. He told her, "I'm not going to drive all the way down to Waikiki to get cocaine for you tonight. I'll see what I can get for you in the area." So he went out.

He couldn't find any [cocaine] in the area because he didn't have any money. All he had was money to buy a pack of cigarettes. So that's exactly what he did. He bought a package of Kools and took it back to the [apartment].

Diana was waiting for him when he came back. And she said, "Did you get me anything? Did you get me anything?" And he said, "This is all I could get." At that point, because of the drugs, because of her drinking, she reacted violently. At that point, she said, "I'm nothing but a fucking junkie. Just go ahead and kill me. You don't care enough to even buy the right kind of cigarettes for me."

Defense counsel then explained that Diana went into the bedroom, grabbed a knife, "and started slashing her gown and telling him, 'Nobody cares for me. You don't care for me. Just kill me.' [Clark] tried to grab the knife away from her[,][a]nd when he grabbed the knife, there was a struggle. And what

8. Hawai'i Rules of Appellate Procedure Rule 28(b) provides in pertinent part that "the appellant shall file an opening brief, containing ... (4)[a] concise statement of the points on which appellant intends to rely,.... The point shall show where in the record the alleged error occurred and where it was objected to...."

happened was Diana struck her[self] with the knife." Clark's objection to this statement fails both prongs of the ineffective assistance of counsel test and, therefore, his contention is virtually frivolous. Despite Clark's contention to the contrary, defense counsel's opening statement reflects an accurate understanding of Clark's and Diana's rendition, at trial, of the events surrounding the incident in question. Thus, Clark's contention that defense counsel's opening statement constituted ineffective assistance is without merit.

### III. CONCLUSION

For the reasons discussed above, we affirm Clark's conviction.