**Electronically Filed
Intermediate Court of Appeals
CAAP-20-0000496
27-SEP-2022
08:02 AM
Dkt. 111 MO**

NO. CAAP-20-0000496

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


STATE OF HAWAI'I, Plaintiff-Appellee,
v.
KATHERINE RENEE MCQUEEN, Defendant-Appellant


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CASE NO. 1CPC-19-0001394)


MEMORANDUM OPINION
(By:  Ginoza, Chief Judge, Hiraoka and Wadsworth, JJ.)

Defendant-Appellant Katherine Renee McQueen (**McQueen**) appeals from the "Judgment of Conviction and Sentence; Notice of Entry" (**Judgment**) entered on May 29, 2020, by the Circuit Court of the First Circuit (**Circuit Court**).[1]  On March 10, 2020, a jury found McQueen guilty as charged of one count of Assault in the Second Degree, in violation of Hawaii Revised Statutes (**HRS**) § 707-711(1)(a), (1)(b) and/or (1)(d) (2014 & Supp. 2019).[2]

---

[1]  The Honorable Paul B.K. Wong presided.

[2]  HRS § 707-711(1) reads in relevant part:

(1) A person commits the offense of assault in the second degree if:
    (a)   The person intentionally, knowingly, or recklessly causes substantial bodily injury to another;
    (b)   The person recklessly causes serious bodily injury to another;
. . . .

(continued...)

On appeal, McQueen argues the Circuit Court erred by: (1) failing to engage her in a "back-and-forth" <u>Tachibana</u> colloquy; (2) making incorrect evidentiary rulings, including (a) failing to strike testimony that mischaracterized the complaining witness, Gabriela Lyle (**Lyle**), as the "victim", (b) ruling that post-arrest evidence of McQueen "slipping handcuffs" was more probative than prejudicial, (c) striking McQueen's testimony that she had a shoulder injury predating the alleged incident, and (d) overruling McQueen's objection to the State's characterization of her during closing argument as "a drunk person" and "that drunk person".

McQueen also argues she was denied effective assistance of counsel because her trial counsel: (a) failed to move for a judgment of acquittal after the Plaintiff-Appellee State of Hawaii's (**State**) opening statement; (b) failed to follow-up on Lyle's "septic" knee injury; (c) failed to question the State's witnesses regarding any evidence of choking injuries to Lyle in addition to a laceration injury; and (d) forced her to testify.

Lyle accused McQueen of attacking her with a knife and causing a five-inch laceration on her arm.  At trial, the State argued McQueen caused Lyle's injury while intoxicated from alcohol.  In defense, McQueen argued she had no reason to and did not attack Lyle.

## I.  Discussion
### A.  <u>Tachibana</u> Colloquy

McQueen contends the Circuit Court violated her rights under <u>Tachibana</u> and its progeny because the colloquies provided to her did not constitute a "true exchange" in that it is unknown whether McQueen "actually understood" or had the "the correct understanding" of the Circuit Court's advisement, despite that

---

[2](...continued)
(d)   The person intentionally or knowingly causes bodily injury to another with a dangerous instrument[.]

she answered yes or no to the questions.  See e.g., Tachibana v. State, 79 Hawaiʻi 226, 236 n.7, 900 P.2d 1293, 1303 n.7 (1995) (noting basic instructions a court should provide regarding a defendant's right to testify and not to testify); State v. Lewis, 94 Hawaiʻi 292, 294, 12 P.3d 1233, 1235 (2000) (concluding that the prior-to-trial advisement recommended in Tachibana should thereafter be mandated).  McQueen asserts it was error for the court to read each of the Tachibana rights to her one by one, and then only ask yes-or-no questions as to whether she understood her rights.[3]

We conclude the Circuit Court did not err in conducting its colloquies pursuant to Tachibana and its progeny.  A "[c]olloquy is defined as '[a]ny formal discussion, such as an oral exchange between a judge, the prosecutor, the defense counsel, and a criminal defendant in which the judge ascertains the defendant's understanding of the proceedings and of the defendant's rights.'"  State v. Chong Hung Han, 130 Hawaiʻi 83, 90, 306 P.3d 128, 135 (2013), as corrected (July 10, 2013), as corrected (July 31, 2013) (second alteration in original) (emphasis omitted) (quoting Black's Law Dictionary 300 (9th ed. 2009)).  In Han, the Hawaiʻi Supreme Court held that a "true colloquy" did not occur where the trial court failed to sufficiently "engage[] in a verbal exchange with [the defendant] to ascertain [the defendant's] understanding of significant propositions in the advisement."  Id.; see also State v. Pomroy, 132 Hawaiʻi 85, 93, 319 P.3d 1093, 1101 (2014), as corrected (Jan. 29, 2015) (concluding colloquy deficient because "the

---

[3]  The State asserts that McQueen failed to object to the manner in which the Circuit Court advised her of her right to testify and her right not to testify, and that McQueen thus waived this issue.  However, Hawaiʻi appellate courts have consistently addressed this issue on a plain error basis.  See State v. Staley, 91 Hawaiʻi 275, 287, 982 P.2d 904, 916 (1999) (holding there was plain error due to circuit court's failure to establish on the record that defendant's decision not to testify was made knowingly and voluntarily); State v. Celestine, 142 Hawaiʻi 165, 173, 415 P.3d 907, 915 (2018) ("Once a violation of the constitutional right to testify is established, the conviction must be vacated unless the State can prove that the violation was harmless beyond a reasonable doubt.") (citations omitted); Hawaiʻi Rules of Penal Procedure Rule 52.

district court recited a litany of rights[,] it then asked [the defendant] if he 'understood that,' and it [was] unclear which right 'that' referenced");[4] State v. Celestine, 142 Hawai'i 165, 171, 415 P.3d 907, 913 (2018).

Here, the Circuit Court had the following pretrial exchange with McQueen:

> [Circuit Court:] I want to move on now to the next topic. In this trial, Ms. McQueen, you have the constitutional right to testify in your own defense. Do you understand what that means?
>
> [McQueen:] Yes.
>
> [Circuit Court:] You should consult with your lawyer about your decision to testify. But it is your decision. And no one can stop you from testifying, if that's what you choose to do. Do you understand that?
>
> [McQueen:] Yes.
>
> [Circuit Court:] If you choose to testify, the prosecutor . . . will have the opportunity to cross-examine or ask you questions. Do you understand what that means?
>
> [McQueen:] Yes.
>
> [Circuit Court:] Do you have any questions about what happens if you choose to testify in the trial?
>
> [McQueen:] No.
>
> [Circuit Court:] You also have a constitutional right to not testify and to remain silent. Do you understand what that means?
>
> [McQueen:] Yes.
>
> [Circuit Court:] If you choose not to testify, the jury will be instructed that it cannot hold your silence, as well as your decision to not testify, against you when it decides the case. Do you have any questions about what that means?
>
> [McQueen:] No.
>
> [Circuit Court:] Do you understand what happens if you choose not to testify?
>
> [McQueen:] Yes.

In the ultimate colloquy before McQueen decided to testify, the following exchange occurred, in relevant part:

---

[4]  In Pomroy, the supreme court also determined the lower court failed to advise the defendant that "he had the right not to testify and that no one can prevent him from testifying." 132 Hawai'i at 92, 319 P.3d at 1100.

[Circuit Court]: When we started this trial, I told you you have the constitutional right to testify in your own defense. Do you understand what that means?

[McQueen]: Yes.

[Circuit Court]: You should consult with your lawyer about your decision to testify. But it is your decision. And if you want to testify, nobody can stop you from doing so. Do you understand that?

[McQueen]: Yes.

. . . .

[Circuit Court]: You also have the constitutional right to not testify, and to remain silent. Do you understand what that means?

[McQueen]: Yes.

[Circuit Court]: If you choose not to testify, the jury will be instructed that it cannot hold your decision to not testify and it cannot hold your silence against you in any way when it decides the case. Do you understand what that means?

[McQueen]: Yes.

[Circuit Court]: Do you understand what happens if you choose not to testify?

[McQueen]: Yes.

[Circuit Court]: Did you have a chance to talk to Mr. Amadi about your decision?

[McQueen]: Yes.

[Circuit Court]: Did you have enough time?

[McQueen]: Yes. Yes.

[Circuit Court]: Okay. Did you need more time to discuss it with Mr. Amadi?

[McQueen]: No.

[Circuit Court]: Okay. And what is your decision? Is it to testify, or not testify?

[McQueen]: To testify.

(Format altered.)

In both the pre-trial advisement and ultimate colloquy, the Circuit Court engaged in a "true exchange" by verbally ascertaining McQueen's understanding after each question with

5

regard to her right to testify and her right not to testify.[5]
The Circuit Court also provided McQueen opportunities to ask
questions regarding her right to testify or not testify.
Moreover, the questions were clear and pointed.  Further, the
record is devoid of any indication that McQueen was, at any
point, confused by the Circuit Court's questions.  Nor does
McQueen claim to have been confused by the ultimate colloquy.

McQueen asserts this case is similar to State v.
Eduwensuyi, 141 Hawaiʻi 328, 409 P.3d 732 (2018).  We disagree.
In Eduwensuyi, the Hawaiʻi Supreme Court held that the trial
court failed to include necessary advisements in its colloquies.
Id. at 333-34, 409 P.3d at 737-38.  Thus, the supreme court
declined to address Eduwensuyi's argument that the trial court
failed to engage in a true colloquy.  Id. at 333-34, 337 n.11,
409 P.2d at 737-38, 741 n.11.

We conclude the Circuit Court properly advised McQueen
of her rights under Tachibana and its progeny.

### B.  Evidentiary Rulings

### 1.  Reference to Lyle as a "victim" was harmless error

McQueen argues the Circuit Court erred in not striking
testimony referring to Lyle as a "victim," although the court
properly sustained the defense's objection to the use of that
term.

John Lee (**Lee**) was a witness for the State who
testified that he applied a tourniquet to Lyle's arm and called
911 after Lyle ran out of an apartment following the incident.
Lee testified that while he was on the phone with dispatch, he
was "[w]atching the victim.  Making sure she didn't . . .
collapse or go into shock."  Defense counsel objected to the

---

[5]  Given that McQueen decided to testify, the advisements regarding her
right not to testify are relevant.  See Lewis, 94 Hawaiʻi at 293-94, 12 P.3d
at 1234-35 (quoting Tachibana, 79 Hawaiʻi at 236 n. 7, 900 P.2d at 1303 n. 7)
("In connection with the privilege against self-incrimination, the defendant
should also be advised that he or she has a right not to testify and that if
he or she does not testify then the jury can be instructed about that
right.").

6

characterization of Lyle as "the victim" and moved to strike. The Circuit Court stated, "[i]t's granted" but "the motion to strike is denied."  The Circuit Court then instructed Lee to refer to Lyle as "woman" or "complaining witness."  Prior to deliberation, the court instructed the jury that McQueen should be presumed innocent unless proven guilty beyond a reasonable doubt.[6]

"Counsels and witnesses should refrain from using the term 'victim,' as the term is 'conclusive in nature and connotes a predetermination that the person referred to had in fact been wronged.'" State v. Stan, CAAP-18-0000579, 2021 WL 1199823, at *4 (Haw. App. Mar. 30, 2021) (SDO) (citing State v. Mundon, 129 Hawaiʻi 1, 26, 292 P.3d 205, 230 (2012)).  However, the use of the term by a witness or the prosecution will not always result in prejudicial error requiring that a conviction be vacated.  See id.; State v. Nomura, 79 Hawaiʻi 413, 417-18, 903 P.2d 718, 722-23 (App. 1995) (use of term "victim" in instruction to jury was harmless error even though whether complaining witness was abused was a question yet to be determined by jury).

Here, Lee was a lay witness who referred to Lyle as a "victim" one time.  In these circumstances, Lee's use of the term was harmless given that the court sustained the objection, instructed the witness to refrain from using the term, and instructed the jury at the end of trial that a defendant is presumed innocent unless proven guilty.  See Mundon, 129 Hawaiʻi at 25-26, 292 P.3d at 229-230 ("use of the term 'victim' in the limited circumstances of this case was not prejudicial to [the defendant]" where court sustained an objection to use of the term by a witness but overruled objections to the state's use of the term during the testimony of three police officers).

---

[6]  The Circuit Court's instruction to the jury was: "You must presume the defendant is innocent of the charge against her. This presumption remains with the defendant throughout the trial of the case, unless and until the prosecution proves the defendant guilty beyond a reasonable doubt."

### 2.  Evidence of McQueen Slipping Handcuffs
### a.  The evidence was relevant

McQueen next contends it was error for the Circuit Court to admit evidence that after being detained, McQueen "slipped the handcuffs" three times while in a Honolulu Police Department (**HPD**) patrol car.[7]  At trial, the State argued the evidence was relevant in the event McQueen claimed it was physically impossible for her to stab Lyle due to voluntary intoxication.  On appeal, the State argues that "[t]he probative value of McQueen slipping the handcuffs was significant because it showed that she had the ability to control her movements, or conduct, very soon after the stabbing despite being intoxicated" and cites to HRS § 702-230(2) (2014 & Supp. 2019).[8]  We conclude the Circuit Court was not wrong to admit this evidence.

In the State's case-in-chief, Officer Reid Nakamura (**Officer Nakamura**) testified that his first interaction with McQueen was in the back seat of his patrol car where he "had noticed that she had slipped the handcuffs[.]"  Defense counsel objected, arguing that any observations of McQueen slipping the handcuffs were irrelevant and prejudicial.  The following discussion then ensued:

> [Circuit Court]: Is the objection to the state eliciting evidence of defendant's demeanor, or the fact that she was slipping out of handcuffs?
>
> [Defense Counsel]: Slipping out of handcuffs.
>
> [Circuit Court]: So you're allowed to get into his physical observations of the defendant.

---

[7]  The evidence was presented in the State's case-in-chief.  Although McQueen had not made an argument claiming physical impossibility due to voluntary intoxication at that time, counsel also did not disclaim that such a defense would not be used.

[8]  HRS § 702-230(2) (2014) provides, in relevant part:

> (2) . . . .  Evidence of self-induced intoxication of the defendant is admissible to prove or negative conduct or to prove state of mind sufficient to establish an element of an offense. Evidence of self-induced intoxication of the defendant is not admissible to negative the state of mind sufficient to establish an element of the offense.

[State]: Right. But that was -- the state would  argue
that they cannot be separated. The act of slipping out
of the handcuffs if someone's handcuffed, the state's
going to argue that, you know, it's not normal to try
and slip out of them. It's not something that a
normal, sober person would do, if they're in the back
of a police vehicle. And attempt to slip out of the
handcuffs not once, but twice, even after she's
re-cuffed.

[Circuit Court]: Sobriety and the ability to
slip out of handcuffs are not connected.

[Defense Counsel]: Yes.

[State]: And, well, that's why the state wants that
information is because the voluntary intoxication
defense allows intoxication to negate conduct. And the
state is trying to show that she had physical prowess.

[Circuit Court]: Now I understand where you're –-

[State]: But mentally, as to the state of mind, it
cannot negate. So therefore there is a difference --
there's a reason why.

[Circuit Court]: The relevance goes to the
defendant's ability to control her conduct after she
was in the police custody. Therefore it's imparted
back to her ability to control conduct when she was
still in the apartment. The court finds probative
value to that.

(Format altered.)

After the Circuit Court overruled the objection, Officer Nakamura proceeded to testify that he "noticed [McQueen] with her hands in front. And the handcuffs were still attached to her right wrist, with the left hand free, and then the left handcuff dangling" but "[did not] know how she got out of the handcuffs."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Hawaiʻi Rules of Evidence (**HRE**) Rule 401.  Although all relevant evidence is generally admissible, HRE Rule 402, "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice,"  among other things.  HRE Rule 403.

"A trial court's determination that evidence is 'relevant' within the meaning of HRE Rule 401 (1993) is reviewed under the right/wrong standard of review." State v. St. Clair, 101 Hawaiʻi 280, 286, 67 P.3d 779, 785 (2003) (citation omitted).  In contrast, a trial court's balancing of the probative value of evidence against the prejudicial effect of such evidence under HRE Rule 403 (1993) is reviewed for abuse of discretion.  State v. Richie, 88 Hawaiʻi 19, 37, 960 P.2d 1227, 1245 (1998).

Here, evidence that McQueen slipped the handcuffs is relevant to her physical ability soon after the incident notwithstanding evidence of her alcohol consumption.  Officer Nakamura testified he did not know how McQueen actually slipped the cuffs, but that McQueen's hands were initially cuffed behind her back and then seen in the front of her body, which evidences physical prowess to move her hand from behind her body to the front.  This is relevant to McQueen's potential defense of physical impossibility due to voluntary intoxication.[9] Therefore, the Circuit Court did not err in admitting the evidence.

### b.  The evidence was more probative than prejudicial

Courts consider the following factors when weighing the probative value of evidence against the prejudicial effect: "the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence will probably rouse the jury to overmastering hostility."  State v. Uyesugi, 100 Hawaiʻi 442, 463, 60 P.3d 843, 864 (2002) (evidence not more prejudicial than probative where it was necessary to show defendant had knowledge

---

[9] McQueen also argues the Circuit Court was wrong to impart McQueen's ability to control her conduct back to when she was still in the apartment because the time gap between the incident and when police arrested McQueen could have provided opportunity for McQueen to become intoxicated.  However, given the testimony by Lyle and McQueen that McQueen had been consuming alcohol between 1:00 p.m. and 5:00 p.m. and Lyle's testimony of McQueen's actions, there was ample evidence of McQueen's consumption of alcohol before the incident.

and ability to plan crime in light of conflicting evidence available and defendant's defense) (citation omitted).

Here, the factors weigh in favor of admission of the testimony.  The evidence was necessary for the State to prove it was physically possible for McQueen to have committed the alleged offense, in the event she asserted physical impossibility due to voluntary intoxication as a defense.  This need is underscored by the fact that McQueen was already claiming physical impossibility as a defense.[10]  There was also limited evidence demonstrating McQueen's physical abilities in light of other evidence calling into question her ability to control her body.[11]

Moreover, McQueen's argument that the evidence "make[s] her seem a seasoned criminal, and [makes] her appear guilty – as if she needs to escape police" is unconvincing.  In testifying that McQueen had slipped the handcuffs multiple times, Officer Nakamura did not state McQueen attempted to escape from the police or insinuate such.  The evidence was not likely to rouse a jury to overmastering hostility.  We conclude the Circuit Court did not abuse its discretion in its HRE Rule 403 balancing of this evidence.

### 3.  Exclusion of testimony about McQueen's preexisting injury was harmless

Next, McQueen argues the Circuit Court improperly excluded her testimony regarding a shoulder injury predating the incident.  The State argues there was no error because it only objected to the part of McQueen's testimony requiring a medical opinion and defense counsel stated "if it's about [the State]

_____

[10]  McQueen raised physically impossibility due to a preexisting shoulder injury as a potential defense.

[11]  Officer Nakamura testified that when officers began photographing McQueen's hands for evidence, she was instructed to hold her hands out and then make a fist.  However, McQueen failed to follow the simple instructions although she appeared capable of doing so.  Officer Moses Chang (**Officer Chang**) testified that when McQueen was arrested, he observed that she was unable to keep balance and he held her up while escorting her so she would not fall.

objecting for medical testimony . . . you can strike that."  The State also points out that there was other testimony to the effect that McQueen's shoulder injury pre-dated the incident.

During direct examination, when asked why she was wearing a sling in court, McQueen testified:

> [McQueen:] I had to have surgery. I had to have my tendon and rotator collar repaired a couple weeks ago.
>
> [Defense Counsel:] Okay. Is this a -- was this a preexisting injury prior to September 21st or 22nd?
>
> [McQueen:] This was a preexisting injury, because my arm frequent -- was popping up. It was dislocating too many times.

(Format altered.)  Following this testimony, the State objected as follows:

> [State]: Your Honor, the testimony regarding the rotator cuff and the surgery is a medical opinion, especially on the rotator cuff being torn, and the shoulder injury . . . .
>
> [Circuit Court]: So what remedy do you want?
>
> [State]: I would like the court -- I mean, I would like the court to strike at the very least, and give a curative instruction. . . . I think I'm okay with just striking the testimony, and giving a curative instruction, and the court's emphasis that [the jury is] not to consider any injury to the defendant's shoulder, or any testimony regarding a prior injury.

(Format altered.)

After sustaining the State's objection, the Circuit Court stated the following to the jury:

> The objection is sustained. Motion is granted. So, ladies and gentlemen of the jury, you're to disregard Ms. McQueen's last answer regarding the injury to her shoulder. It actually calls for a medical conclusion. So she's not the doctor. That testimony is stricken, you're not [to] consider as part of your consideration of the case.

(Format altered.)

In other testimony by McQueen, however, she testified her shoulder injury pre-dated the incident.  On cross-examination, McQueen testified that she had a shoulder injury

prior to September 22, 2019 and that it had "been weak for about two years" prior to the incident.

We conclude the Circuit Court did not err in striking McQueen's testimony about her shoulder surgery to repair her "tendon and rotator collar" and that it was a "preexisting injury" in that such testimony called for a medical opinion. McQueen was nonetheless allowed to testify separately about her shoulder injury.

### 4. The Circuit Court did not err regarding the characterization of McQueen in closing argument

Lastly, McQueen contends the State improperly characterized her as "a drunk person" or "that drunk person" in closing argument.  McQueen argues using these terms "connote[s] a predetermination of motive for the alleged crime" and places her "in an abhorrent light before the jury" because of the association most people have with the term "drunk."  The State argues that characterizing McQueen as "drunk" in its closing argument was a permissible and reasonable inference based on the evidence from the State's witnesses and McQueen's own admission that she had been drinking alcohol the day of the incident.  We conclude there was no error.

The supreme court has stated:

> [A] prosecutor, during closing argument, is permitted to draw reasonable inferences from the evidence and wide latitude is allowed in discussing the evidence. It is also within the bounds of legitimate argument for prosecutors to state, discuss, and comment on the evidence as well as to draw all reasonable inferences from the evidence.

State v. Clark, 83 Hawaiʻi 289, 304, 926 P.2d 194, 209 (1996) (citations omitted).

Here, characterizing McQueen as "a drunk" and "that drunk person" was a reasonable inference within the wide latitude afforded to prosecutors.  First, McQueen herself admitted to consuming alcohol before the incident.  Officer Nakamura testified that McQueen could not follow simple instructions, and Officer Chang testified McQueen was "really unsteady on her feet"

and that she would have likely fallen if he had not held her up while escorting her.  Both Officers Nakamura and Chang also testified McQueen was "slurring" her words during their interactions with her.  Another officer, Jason Yee Hoy, testified that McQueen "[s]melled like the odor of alcohol" during his interaction with McQueen following the incident.  Moreover, Lyle testified that on the evening of the incident, McQueen fell and knocked over the TV in the apartment, fell into the front door, and spoke nonsensically.

The State presented the following, in closing argument:

> We first heard from [Lyle], who told you that this was not the same person who she interacted with the day before. Yesterday, she was nice. Earlier in the day, she bought her lunch and food. But this was a different person. She was stumbling over herself, knocking into furniture, falling over, mumbling to herself, saying things that didn't make sense, aggressive, yelling at her, calling her names. She was upset because [Lyle] was lying down all day, and she had to clean because she wanted to make the apartment nice for her friend's inspection.

> And that testimony was consistent with what the officers told you, that she had slurred words. She was unsteady on her feet. She could not walk unassisted.

> Officer Moses Chang told you that if he didn't assist her down those stairs, she definitely would have fallen. Officer Nakamura said she was unable to follow simple instructions. He said she was told to make her hands into a fist and keep them in a fist. She kept opening and closing them. Officer Yee Hoy told you that when he escorted her down, he smelled an odor of alcohol on her.

> And by the defendant's own admission, she had two full glasses of Mike's Hard Lemonade.

> . . . .

> I want to focus . . . on the probability of what [Lyle says] and whether it was supported by the evidence. Now, what did she say? She said that around 6 or 7 p.m., she got into an argument with a drunk person, that drunk person got upset –

> . . . .

> And it's also supported by the evidence.

(Format altered.)

There was ample evidence in the record from which the State could reasonably infer and argue that McQueen was drunk during the incident.  The Circuit Court did not err in denying

14

McQueen's objection to the State's characterization of her during closing argument.

## C. Ineffective assistance of trial counsel claims

McQueen also argues she was denied effective assistance where her trial counsel failed to 1) move for judgment of acquittal after the State's opening statement; 2) inquire about the effects of Lyle's septic knee on her behavior; 3) question the State's witnesses about the lack of choking injuries on Lyle after the incident; and 4) allow McQueen to decide for herself whether to testify.[12]

A defendant has the burden to prove ineffective assistance of counsel by demonstrating 1) "that there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence[;]" and 2) "that these errors or omissions resulted in either the withdrawal or substantial impairment of a potentially meritorious defense." State v. Salavea, 147 Hawaiʻi 564, 576, 465 P.3d 1011, 1023 (2020) (citation omitted). Importantly, "[s]pecific actions or omissions that are alleged to be erroneous but that had an obvious tactical basis for benefitting the defendant's case will not be subject to further scrutiny." Id.

### 1. Defense counsel was not required to seek judgment of acquittal after the State's opening statement

McQueen argues her trial counsel should have filed a motion for judgment of acquittal after the State failed to assert in its opening statement that it would prove the incident occurred in the City and County of Honolulu. This argument is without merit.

The trial court has the authority to grant a motion for judgment of acquittal at the close of the prosecutor's opening statement if it is clear that the prosecution's argument will

---

[12] HRAP Rule 28(a) provides: "If a brief raises ineffective assistance of counsel as a point of error, the appellant shall serve a copy of the brief on the attorney alleged to have been ineffective." Here, the record reflects that McQueen failed to serve the opening brief on trial counsel. McQueen's appellate counsel is therefore cautioned to comply with HRAP Rule 28(a).

fail regardless of other evidence that may be introduced.  State v. Simpson, 64 Haw. 363, 368, 641 P.2d 320, 323-24 (1982).  However, "[a]n opening statement merely provides an opportunity for counsel to advise and outline for the jury the facts and questions in the matter before them[;] . . . [it] is not evidence."  Id. at 369, 641 P.2d at 324 (citations omitted).  Thus, a motion at the close of the prosecutor's opening statement is rarely granted.  Id. at 368, 641 P.2d at 323.

In criminal cases, the State is required to prove venue beyond a reasonable doubt.  HRS § 701-114(1)(d) (2014).[13]  Under Hawaiʻi Rules of Penal Procedure (**HRPP**) Rule 18, "the prosecution shall be had in the circuit in which the offense or any part of it was committed."  Moreover, "[t]he first judicial circuit is the island of O[ʻ]ahu[.]"  HRS § 603-1(1).  As this court has stated, "the City and County of Honolulu covers the same area as the first judicial circuit . . . . Consequently, proof that an event occurred in the City and County of Honolulu or on the Island of O[ʻ]ahu is proof that it occurred within the first judicial circuit."  State v. Correa, 5 Haw. App. 644, 650, 706 P.2d 1321, 1325 (1985).

Here, the State proffered the following during its opening statement: "[Lyle] found herself pinned underneath the defendant, Katherine Renee McQueen, in a Waikiki studio -- in a Waikiki studio apartment"; "This assault occurred on the eighth floor of 2509 Ala Wai Boulevard"; "[Lyle] wasn't sure whether she was going to move back to Kauai or stay on Oahu"; "Tony brought the defendant to 2509 Ala Wai Boulevard"; "She works at a bar called Kelly O'Neil's, which is also in Waikiki"; "You're also

_____

[13]    HRS § 701-114(1) states, in relevant part:

     (1)    Except as otherwise provided in section 701-115, no person may be convicted of an offense unless the following are proved beyond a reasonable doubt:
     . . . .
     (d) Facts establishing venue[.]

16

going to hear from <u>Honolulu Police Department</u> officers"; and "Dr. Yost is a trauma surgeon at <u>Queen's medical</u>."  (Emphases added.)

The opening statement does not clearly indicate the State would fail to prove the incident occurred on Oʻahu. <u>Simpson</u>, 64 Haw. at 368, 641 P.2d at 323. In fact, the State introduced ample evidence during the trial that the incident occurred in the City and County of Honolulu during direct examination of Lee, Perez's apartment office manager, and one of the HPD officers who responded to the scene of the incident.

Based on the record, McQueen's trial counsel did not erroneously fail to seek judgment of acquittal after the State's opening statement, and McQueen was not denied effective assistance of counsel on this basis.

## 2.  Whether trial counsel was ineffective for not pursuing questions about Lyle's septic knee should be addressed in an HRPP Rule 40 proceeding

Next, McQueen argues her trial counsel was ineffective for failing to inquire about Lyle's septic knee as an "alternative theory for the source of [Lyle's] knife wound[,]" considering the possible symptoms of being septic.[14]

While "matters presumably within the judgment of counsel, like trial strategy, 'will rarely be second-guessed by judicial hindsight[,]'" <u>State v. Smith</u>, 68 Haw. 304, 311, 712 P.2d 496, 501 (1986), <u>as amended</u> Jan. 14, 1986, where the record does not explain a legitimate rationale for defense counsel's decision within the range of competence demanded of criminal attorneys, this court may deny a claim of ineffective assistance of counsel without prejudice to the defendant to raise such claims at an HRPP Rule 40 proceeding. <u>See</u> <u>State v. Ramos</u>, No. 28356, 2009 WL 353290, at *14 (Haw. App. Feb. 6, 2009) (mem.)

_____

[14]  In her Opening Brief, McQueen lists a variety of effects from being septic as published on the Center of Disease Control's website.  Based on such asserted effects, McQueen argues her trial counsel should have offered an alternative explanation for Lyle's injuries, including that Lyle inflicted the injuries on herself, or that Lyle's condition could have affected her memory of what had occurred.

17

(denying defendant's ineffective assistance of counsel claim without prejudice to raising claim in an HRPP Rule 40 proceeding where record did not adequately explain why trial counsel chose to pursue lines of inquiry that elicited testimony from officer pertaining to defendant's past criminal activities).

Here, McQueen's trial counsel questioned Dr. Yost, Lyle's treating physician after the incident, regarding Lyle's septic diagnosis, to which Dr. Yost responded he believed Lyle was septic prior to the incident, the infection was from her right knee, a person who is septic could exhibit signs of fatigue, and whether someone who is septic could experience symptoms of a cold or a flu would depend on how sick the person was at that point.  However, the record does not adequately explain why McQueen's trial counsel stopped short of questioning Dr. Yost about the effects of being septic and its impacts on Lyle's behavior.  Without more, it is unclear whether McQueen's trial counsel declined to pursue this line of questioning "pursuant to a legitimate trial strategy and within the range of competence demanded of attorneys in criminal cases."  Ramos, 2009 WL 353290, at *14 (mem. op.) (citation omitted).  As earlier noted, McQueen failed to serve her trial counsel with the Opening Brief in this appeal, thus precluding a response from trial counsel.  McQueen's claim of ineffective assistance of counsel on this basis is denied without prejudice to McQueen raising this claim in an HRPP Rule 40 proceeding where trial counsel has an opportunity to respond to the claim and the record can be properly developed.

### 3.  Trial counsel was not ineffective in failing to elicit testimony regarding choking marks on Lyle

McQueen also argues she received ineffective assistance of counsel because trial counsel did not elicit any testimony about the lack of choking injuries sustained by Lyle during the incident.  We conclude this argument is without merit.

Lyle testified that during the incident, "[McQueen's] whole body weight was on me. And she had her hand on my neck" for

18

about three minutes, "[j]ust holding my neck[.]" Dr. Yost testified that when Lyle was admitted to the emergency room for treatment, Lyle's clothing was removed and he did a "quick examination of the patient to see if there [were] any other injuries." Dr. Yost then testified: "We didn't find any other trauma." On cross-examination, trial counsel asked Dr. Yost about any other injuries found on Lyle, to which he reiterated none were found.

On appeal, McQueen's counsel attempts to construe Lyle's testimony as an unsubstantiated allegation that McQueen choked Lyle because there is no evidence that Lyle sustained any injuries around her neck. Notably, however, Lyle never alleged McQueen choked her at any point to prompt trial counsel to inquire about the lack of injuries around Lyle's neck. Based on the record, McQueen has not demonstrated there were specific errors or omissions reflecting counsel's lack of skill, judgment, or diligence in this regard. McQueen's trial counsel was not ineffective on this point.

### 4. The record does not reflect that trial counsel forced McQueen to testify

Last, McQueen argues she "made no knowing, intelligent, or voluntary decision" to testify because the Circuit Court's colloquy was deficient and because her trial counsel mandated that she testify. This argument is without any support in the record.

As noted above, the Circuit Court did not err in advising McQueen of her <u>Tachibana</u> rights. Indeed, the court specifically asked McQueen whether she understood if it was her decision alone to testify:

> [Circuit Court]: When we started this trial, I told you you have the constitutional right to testify in your own defense. Do you understand what that means?
>
> [McQueen]: Yes.
>
> [Circuit Court]: You should consult with your lawyer about your decision to testify. <u>But it is your decision.</u> And if you want to testify, nobody can stop you from doing so. Do you understand that?
>
> [McQueen]: Yes.

(Emphasis added) (format altered).  Further, McQueen fails to cite where in the record her trial counsel "took the decision [whether to testify] away from [her.]"  Notably, at the conclusion of McQueen's sentencing hearing she thanked the court for the opportunity to have a trial and to testify at her trial despite disagreeing with the verdict.  Contrary to her argument on appeal, this indicates McQueen's decision to testify was of her own volition.  McQueen's claim of ineffective assistance of trial counsel based on being forced to testify by her trial counsel is rejected.

## II.  Conclusion

Based on the foregoing, the May 29, 2020 "Judgment of Conviction and Sentence; Notice of Entry" entered by the Circuit Court of the First Circuit is affirmed.  However, McQueen may pursue her ineffective assistance of counsel claim in an HRPP Rule 40 proceeding with respect to whether trial counsel improperly failed to pursue further inquiry about Lyle's septic knee.

DATED:  Honolulu, Hawaiʻi, September 27, 2022.

| On the briefs: | /s/ Lisa M. Ginoza<br>Chief Judge |
|---|---|
| Kai Lawrence,<br>for Defendant-Appellant | /s/ Keith K. Hiraoka<br>Associate Judge |
| Sonja P. McCullen,<br>Deputy Prosecuting Attorney,<br>for Plaintiff-Appellee | /s/ Clyde J. Wadsworth<br>Associate Judge |